HOLLAND & HART LLP
Shawn T. Welch (#7113)
Richard D. Flint (#7525)
Michelle Quist (#13559)
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700
stwelch@hollandhart.com
rdflint@hollandhart.com
mlquist@hollandhart.com

Rob Van Dyke (#12704)
Deputy Kane County Attorney
76 N. Main Street
Kanab, Utah 84741
Telephone: (435) 644-5278
rvandyke@kane.utah.gov

*Attorneys for Plaintiff Kane County, Utah*

Kathy A.F. Davis (#4022)
Kaitlin Tess Davis (#15831)
ASSISTANT ATTORNEYS GENERAL
Sean D. Reyes (#7969)
UTAH ATTORNEY GENERAL
1594 W. North Temple, Suite 300
Salt Lake City, Utah 84116
Telephone: (801) 537-9801
kathydavis@agutah.gov
kaitlindavis@agutah.gov

*Attorneys for Plaintiff State of Utah*

---

## IN THE UNITED STATES JUDICIAL DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KANE COUNTY, UTAH (2), (3) and (4), a Utah political subdivision; and STATE OF UTAH,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>     Defendant, | **PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES' SUPPLEMENTAL BRIEF**<br><br>**Case No. 2:10-cv-01073**<br>**Case No. 2:11-cv-1045**<br>Judge: Hon. Clark Waddoups |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .........................................................**Error! Bookmark not defined.**

INTRODUCTION .................................................................................................1

BACKGROUND LAW ........................................................................................2

   A. Revised Statute 2477. ..................................................................................2

      1. The BLM Lacks Authority To Decide The Holders Of R.S. 2477 Rights-of-
         Way. .....................................................................................................3

      2. The DOI Has No Right Or Authority To Decide Whether Plaintiffs Own Vested
         Title And Further Lacks Authority To Regulate R.S. 2477 Rights-of-Way......4

      3. The DOI Has Refused To Make An Administrative Determination For Over
         Fifteen Years And Administrative Determinations Do Not Bind Anyone. .......6

   B. Federal Quiet Title Act. ...............................................................................8

      1. The QTA's Statute Of Limitations. ...............................................................8

      2. The Quiet Title Act's Waiver Of Sovereign Immunity...................................11

      3. Plaintiffs Have Pleaded And Demonstrated An Express or Implicit Title
         Dispute Beyond A Cloud On Title..................................................................12

         Question 1. What is the proper definition of a "holder" of an R.S. 2477 right-of-
            way?.....................................................................................................13

         Question 2. If a "holder" includes one who holds a vested property right, even if
            title has not been perfected, does the act of refusing to consult on a road
            improvement, or the act of refusing to allow regular maintenance,
            constitute a denial that the State and County hold an R.S. 2477 right, so as
            to trigger the case or controversy requirement under the QTA?.............15

         Question 3. If so, when was the statute of limitations triggered, if at all, for the
            remaining eight roads at issue? ...............................................................17

      1. Plaintiffs Have Shown A Justiciable Title Dispute Under The Quiet Title Act............18

      2. Plaintiffs Timely Filed Their Lawsuits Within The Quiet Title Act's Statute of
         Limitations. ...................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska v. United States*,
201 F.3d 1154 (9th Cir. 2000) ................................................................13

*Block v. North Dakota*,
461 U.S. 273 (1983)..................................................................8, 9, 10

*Clouser v. Espy*,
42 F.3d 1522 (9th Cir. 1994) ................................................................5

*George v. United States*,
672 F.3d 942 (10th Cir.2012) ................................................9, 10, 11

*Haynes v. Williams*,
88 F.3d 898 (10th Cir. 1996) ................................................................13

*In re Hoopiiana Trust*,
2006 UT 53, 144 P.3d 1129 ................................................................11

*Judd v. Bowen*,
2017 UT App 56, 397 P.3d 686 ................................................................14

*Kane Cnty. v. United States*,
772 F.3d 1205 (10th Cir. 2014) ................................................12, 13, 17

*Kane County (1), Utah v. United States*,
Case No. 2:08-cv-0315 CW (D. Utah)..................................7, 12, 13

*Kane County, et al. v. Salazar*,
562 F.3d 1077 (10th Cir 2009) ................................................18, 19

*Kinetica Partners, LLC v. United States DOI*,
505 F. Supp. 3d 653 (S.D. Tex. 2020) ................................................14

*Knapp v. United States*,
636 F.2d 279 (10th Cir. 1980) ................................................................13

*Metro. Water Dist. of Salt Lake & Sandy v. SHCH Alaska Tr.*,
2019 UT 62, 452 P.3d 1158................................................................14

I

*Metro. Water Dist. of Salt Lake & Sandy v. Sorf*,
  2019 UT 23, 445 P.3d 443 ................................................................16, 17

*Pac. Sw. Realty Co. v. Cty. of L.A.*,
  820 P.2d 1046 (Cal. 1991) ...........................................................................13

*S. Utah Wilderness All. v. BLM*,
  425 F.3d 735 (10th Cir. 2005) ............................................................... *passim*

*Salt Lake City S. R.R. Co. v. State Tax Comm'n*,
  1999 UT 90, 987 P.2d 594 ...........................................................................14

*Sierra Club v. Hodel*,
  848 F.2d 1068 (10th Cir. 1988) .....................................................................3

*United States v. Jenks*,
  22 F.3d 1513 (10th Cir. 1994) .......................................................................6

*United States v. Vogler*,
  859 F.2d 638 (9th Cir. 1988) .........................................................................6

*W. Aggregates, Inc. v. Cty. of Yuba*,
  101 Cal. App. 4th 278 (2002) ....................................................................3, 4

*Wagner v. Doehring*,
  553 A.2d 684 (1989) ....................................................................................14

*Watt v. Western Nuclear, Inc.*,
  462 U.S. 36 (1983) .........................................................................................6

*WDIS, LLC v. Hi-Country Estates Homeowners Assoc.*,
  2019 UT 45, 449 P.3d 171 ...........................................................................11

*Wilderness Soc'y v. Kane County*,
  632 F.3d 1162 (10th Cir. 2011) ...................................................................19

*Wilkins v. United States*,
  598 U.S. 152 (2023) ...........................................................................2, 9, 20

**Statutes**

28 U.S.C. § 2409a(a) ........................................................................................8, 12

28 U.S.C. § 2409a(k) .............................................................................................9

43 U.S.C. § 1782(c) ...............................................................................................5

43 U.S.C. § 1701(h) ...................................................................................................................4

Federal Land Policy and Management Act, P.L. 94-579, 90 Stat. 2786 (October 21, 1976) ...................................................................................................................4

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104–208, 110 Stat. 3009 (1996) .................................................................................................................4

**Other Authorities**

30 C.F.R. § 250.1701 .............................................................................................................14

Rule 30(b)(6) .................................................................................................................7, 8, 16

Plaintiffs Kane County, Utah ("Kane County"), Garfield County, Utah ("Garfield County"), and the State of Utah ("State") (collectively, "Plaintiffs"), provide this Response to Defendant United States' Supplemental Brief.

## INTRODUCTION

In its Memorandum Decision, ECF 773, ("Mem. Dec.") dated October 10, 2023, the Court directed the parties to provide supplemental briefing responsive to three questions:

1. What is the proper definition of a "holder" of an R.S. 2477 right-of-way?

2. If a "holder" includes one who holds a vested property right, even if title has not been perfected, does the act of refusing to consult on a road improvement, or the act of refusing to allow regular maintenance, constitute a denial that the State and County hold an R.S. 2477 right, so as to trigger the case or controversy requirement under the QTA?

3. If so, when was the statute of limitations triggered, if at all, for the remaining eight roads at issue?[1]

The remaining eight roads are those for which the United States contends the Court lacks subject matter jurisdiction due to the lack of a disputed title. *Id*. at 7. They include: K1300 Elephant Cove; K4200 Kitchen Corral; K4500 Willis Creek; K8200 Sit Down Bench; K8600 Little Valley; K6000 House Rock Valley Road; K9000 Hole-in-the-Rock as it traverses Kane County; and G9000 Hole-in-the-Rock as it traverses Garfield County. Mem. Dec. at 7, n.4.

The United States provided its Supplemental Brief in Support of its Motions to Dismiss, ECF 776, ("US Brief") on November 7, 2023.

Plaintiffs' response will address the Court's questions. Plaintiffs' response will also show the United States' inconsistent legal positions and will further show how the allegations in the

---

[1] *Id*. at 11.

operative complaints and evidence adduced at trial prove there is an active case or controversy and title dispute justiciable under the Federal Quiet Title Act, 28 U.S.C. § 2409a ("QTA"). Contrary to the United States' arguments, Plaintiffs alleged with particularity and proved: 1) their existing right, title, and interest to the R.S. 2477 rights-of-way; 2) the express and implicit actions that disputed Plaintiffs' title; and 3) the evidence proving the ongoing title dispute.

Additionally, in light of the Supreme Court's decision in *Wilkins v. United States*, 598 U.S. 152 (2023), the United States cannot reasonably contend that there is no case or controversy, due to the lack of a disputed title, *and* that the statute of limitations has run. US Br. at 7; *see also* Defendant United States' Notice of Supplemental Authority, ECF 762 (reiterating that the QTA statute of limitations applies); Mem. Dec. 2-7 (addressing United States' statute of limitations arguments). If there was any merit to that stratagem in the past, when the QTA statute of limitations was deemed jurisdictional, it wholly fails now where the United States is the party that must show the date, event, and reasonable notice that triggered and ran the statute of limitations.

## BACKGROUND LAW

### A.  Revised Statute 2477.

Plaintiffs recognize that R.S. 2477 law has been extensively briefed to the Court and will only address the most salient issues raised by the request for supplemental briefing. R.S. 2477 was a direct, statutory grant of public highway rights-of-way and no federal agency was involved in the vesting of title. The "right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 761 (10th Cir. 2005) ("*SUWA*").

2

> [T]he establishment of R.S. 2477 rights of way required no administrative
> formalities: no entry, no application, no license, no patent, and no deed on the
> federal side; no formal act of public acceptance on the part of the states or
> localities in whom the right was vested. As the Supreme Court of Utah noted 75
> years ago, R.S. 2477 was a standing offer of a free right of way over the public
> domain, and the grant may be accepted without formal action by public
> authorities.

*Id*. at 741 (citation and quotation marks omitted).

"In fact, because there were no notice or filing requirements of any kind, R.S. 2477 rights of way may have been established—and legal title may have passed—without the BLM ever being aware of it. Thus, *R.S. 2477 creates no executive role for the BLM to play*." *Id*. at 754 (emphasis added).

R.S. 2477 rights-of-way vest when "the road is formed, by user or otherwise." *Id*. at 779. Moreover, because "the grantor, the federal government, was never required to ratify a use on an R.S. 2477 right-of-way, each new use of [an R.S. 2477 road] *automatically vested* as an incident of the easement." *Sierra Club v. Hodel*, 848 F.2d 1068, 1084 (10th Cir. 1988) *overruled on other grounds*, *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir. 1992) (emphasis added).

### 1.  The BLM Lacks Authority To Decide The Holders Of R.S. 2477 Rights-of-Way.

"R.S. 2477 gives the BLM no executive role, and . . . the grant [] take[s] effect without any action on its part." *SUWA,* 425 F.3d at 755. "[N]o application was necessary to acquire specified rights over federal lands, including roadways, nor did such roads have to be recorded after they were established." *W. Aggregates, Inc. v. Cty. of Yuba*, 101 Cal. App. 4th 278, 294 (2002), as supplemented on denial of reh'g (Aug. 16, 2002). Congress "made the creation of

roads extremely easy in the West, and thousands of roads created under the 1866 act continue to exist." *Id.*

In 1976, Congress chose to stop granting new R.S. 2477 rights-of-way, but expressly protected *all* existing R.S. 2477 rights-of-way. Despite repealing R.S. 2477, Congress expressly ordered DOI to manage federal lands "subject to valid existing rights." Federal Land Policy and Management Act, P.L. 94-579, 90 Stat. 2786 (October 21, 1976) ("FLPMA"), 43 U.S.C. § 1701(h), note. "[E]ven as Congress repealed R.S. 2477, it specified that any 'valid' R.S. 2477 rights of way 'existing on the date of approval of this Act' (October 21, 1976) would continue in effect." *SUWA*, 425 F.3d at 741 (citations omitted). Title to Plaintiffs' R.S. 2477 rights-of-way vested before 1976 and there is no further action necessary to vest Plaintiffs' title.

## 2.   The DOI Has No Right Or Authority To Decide Whether Plaintiffs Own Vested Title And Further Lacks Authority To Regulate R.S. 2477 Rights-of-Way.

In 1994, the DOI proposed new regulations to give it the authority to formally determine and regulate R.S. 2477 rights-of-way. *SUWA*, 425 F.3d at 756. In 1996, Congress blocked the regulations and broadly protected Plaintiffs' R.S. 2477 rights-of-way by prohibiting the United States from regulating such roads. "No final rule or regulation of any agency of the federal government pertaining to the recognition, *management or validity* of a right-of-way pursuant to [R.S. 2477] shall take effect unless expressly authorized by an act of Congress subsequent to the date of enactment of this act." Pl. Ex. 409 (emphasis added) (U.S. Department of the Interior and Related Agencies' Appropriations Act, 1997, § 108, enacted by the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104–208, 110 Stat. 3009 (1996)) ("Congressional Prohibition").

The United States argues that "even assuming Plaintiffs hold R.S. 2477 rights, these rights would remain subject to reasonable regulations like these existing restrictions." US Br. 10. This is false. Congress said DOI cannot manage R.S. 2477 rights-of-way "unless expressly authorized by an act of Congress." Pl. Ex. 409 (Congressional Prohibition).

Notably, the United States cannot cite a statute or regulation supporting its asserted authority to restrict and regulate Plaintiffs' R.S. 2477 roads, such as for certain types of motor vehicles. In *SUWA*, the Tenth Circuit cited several older decisions holding that "*changes* in roads on R.S. 2477 rights of way across federal lands are subject to regulation by the relevant federal land management agencies." *Id*. at 746. Plaintiffs have no quarrel with the holding that *changes* in R.S. 2477 rights-of-way are subject to regulation by the relevant federal land management agencies. This is the point of consultation prior to Plaintiffs making improvements. Plaintiffs further have no quarrel with the BLM's authority to protect public lands from unnecessary and undue degradation. "[I]n managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources." 43 U.S.C. § 1782(c). DOI (including the BLM and the National Park Service) has the right to protect public lands from unnecessary and undue degradation, but has no right to regulate R.S. 2477 roads. It has been prohibited from doing so.

Here, however, DOI has crossed the line and has attempted to regulate Plaintiffs' R.S. 2477 rights-of-way to restrict types of vehicles and uses. The United States argues that DOI can regulate Plaintiffs' roads and cites *Clouser v. Espy*, 42 F.3d 1522 (9th Cir. 1994) in support. US Br. at 10. *Clouser* involved the Forest Service, under the Department of Agriculture, and not the DOI. *Id*. at 1524. Moreover, *Clouser* and the other cited cases all issued *before* the 1996

Congressional Prohibition. *See also United States v. Vogler*, 859 F.2d 638, 642 (9th Cir. 1988); *United States v. Jenks*, 22 F.3d 1513 (10th Cir. 1994).

In a footnote, the United States discusses certain legal principles regarding federal land grants. "It is well-established that 'land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.'" US Br. at 4, n.2., quoting *SUWA*, 425 F.3d at 769 (citing *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59 (1983)).

The United States' discussion is inapposite to the issues the Court identified for supplemental briefing. *Watt*, and related cases, were concerned with the nature of the property granted, not the burden of proof or any presumption at issue in this QTA suit. *See, e.g., Watt*, 462 U.S. at 59 (discussing whether gravel was part of the mineral estate reserved to the United States under the Stock Raising Homestead Act). The nature of the property at issue in this lawsuit—a highway right-of-way—is not in dispute.

### 3.  The DOI Has Refused To Make An Administrative Determination For Over Fifteen Years And Administrative Determinations Do Not Bind Anyone.

The United States references the "Norton Policy", as if that policy ever had any effect, and states that a "holder" is an entity with an adjudicated title or "when an agency has made a non-binding determination of the existence of an R.S. 2477 right-of-way." US Br. at 3; see Pl. Ex. 610 (Norton Policy).

In *SUWA*, the BLM made an administrative determination that the Skutumpah Road was an R.S. 2477 right-of-way. 425 F.3d at 743. The Tenth Circuit's remand acknowledged the determination and directed the parties to litigate "whether Kane County exceeded the scope of its right of way with respect to the Skutumpah Road." *Id*. at 788. Thereafter, DOI Solicitor James K.

6

Karkut informed Kane County that the Skutumpah Road administrative determination did not survive the remand. *See* Plaintiff's Opposition to Motion to Dismiss Amended Complaint, ECF 47, at 26-28.

The 2006 Norton Policy did not last beyond Secretary Norton's tenure, which ended in 2006.[2] Kane County applied for an administrative determination for the Bald Knoll Road in June of 2006, and ultimately was forced to sue to quiet title to the Bald Knoll Road in April of 2008.[3] The BLM spent two years and could not finish a simple, short administrative determination.

Plaintiffs could spend a dozen pages reciting the United States' arguments, in proceeding after proceeding, about "administrative determinations" and "non-binding determinations" as a United States' predicate condition to an entity being a "holder" of a right-of-way. Plaintiffs have already extensively briefed the specific point that the United States has expressly stated that Plaintiffs have no right, title or interest in any R.S. 2477 right-of-way in Utah until adjudicated in court.

However, to summarize, the United States' Rule 30(b)(6) witness (K. Hoffman) testified that he did not know of any administrative determinations that have been completed, and that the BLM had banned such determinations at the time this lawsuit was filed. Pl. Ex. 890, at 71-72 (K. Hoffman Depo.); *see also* Pl. Ex. 611. The United States has treated administrative determinations as non-binding on anyone, including itself, which has made them meaningless to the owners of R.S. 2477 rights-of-way.

---

[2] https://georgewbush-whitehouse.archives.gov/government/norton-bio.html, last visited December 8, 2023.

[3] *See Kane County (1), Utah v. United States*, Case No. 2:08-cv-0315 CW (D. Utah).

7

The United States has also expressly stated that Plaintiffs do not have the right to maintain their R.S. 2477 rights-of-way. Pl. Ex. 890 (Hoffman), at 25-29. The United States' Rule 30(b)(6) witness testified that Plaintiffs have no right or authority to maintain any of the roads in this lawsuit. *Id*. at 28-29. Thus, the United States has expressly denied that Plaintiffs own R.S. 2477 rights-of-way for the eight roads now at issue.

## B.  Federal Quiet Title Act.

Prior to 1972, sovereign immunity barred title suits against the United States. Adverse claimants could seek special legislation from Congress for one-off claims, or they could "induce the United States to file a quiet title action against them." *Block v. North Dakota*, 461 U.S. 273, 280 (1983). That left parties with title claims involving the United States generally without recourse. *Id*. at 282.

"Congress sought to rectify this state of affairs." *Id*. Following numerous compromises and competing versions, recounted in *Block* and the QTA's legislative history, the final version of the statute provided: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). As noted in the *Block*, one of the biggest compromises was to impose a specific time limit of 12 years to cut off stale claims. *See Block*, 461 U.S. at 283-84.

### 1.  The QTA's Statute Of Limitations.

Noting that "when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied," (*id*. at 287), the Supreme Court held that it would not assume that the State of North Dakota was exempt from the QTA's 12-year statute of limitation "in the

absence of express intent to the contrary." *Id*. at 289. And yet the Supreme Court confirmed that "Congress is certainly free to exempt the States from a statute of limitations or any other condition of the waiver." *Id*. at 288.

Following the Supreme Court's 1983 decision in *Block*, Congress quickly amended the QTA in 1986 to "exempt the States" (*id*.) from the 12-year statute of limitations. As amended, the QTA requires notice to the State by communications "with respect to *the claimed lands* which are sufficiently specific as to be reasonably calculated to put the claimant on notice *of the Federal claim* to the lands," or "by the use, occupancy, or improvement of *the claimed lands* which, in the circumstances, is open and notorious. 28 U.S.C. § 2409a(k) (emphasis added).

Here, the "claimed lands" are public highway rights-of-way. "A right of way is not tantamount to fee simple ownership of a defined parcel of territory. Rather, it is an entitlement to use certain land in a particular way." *SUWA*, 425 F.3d at 747. "Easements and servient estates can (and usually do) peaceably coexist." *George v. United States*, 672 F.3d 942, 947 (10th Cir.2012).

As the Court is aware, the Supreme Court in *Wilkins v. United States*, 598 U.S. 152 (2023) effectively overturned 40 years of QTA statute of limitations jurisprudence that commenced with *Block*. After *Block*, the United States could merely assert that the QTA statute of limitations had run, that the limitations period was jurisdictional, and then without more, the plaintiff would bear the burden of proof that it timely filed a claim within the court's jurisdiction. The Supreme Court has rejected the premise and held that "*Block* is a textbook 'drive-by jurisdictional rulin[g].'" *Wilkins*, 598 U.S. at ____, 143 S. Ct. at 878. The QTA's statute of limitations "is a nonjurisdictional claims-processing rule." *Id*. at 881.

*Block* resulted in the Tenth Circuit holding that a property owner, Ms. George, could not put an unlocked livestock control gate across a road within private property because the Forest Service held an easement underlying the road. *George*, 672 F.3d at 943-944. Before the easement was granted in 1979 (*id*. at 943), the Forest Service in 1977 published regulations in the Federal Register stating that no one could place a "'fence . . . without a permit' anywhere in the 'National Forest System' or on its '[f]orest development road[s] or trail[s].'" *Id*. at 945 (citations omitted; alterations original).

"While the QTA waives the government's immunity and affords plaintiffs a relatively generous twelve years to bring suit, the trigger for starting that twelve-year clock running *is an exceedingly light one*." *Id*. at 944 (emphasis added).

> So the clock in our case started not just when Ms. George first knew about the government's claim to an unobstructed easement. *Or even when anyone who owned the land before her knew.* The clock started running when she or her predecessors objectively *should have known* about the government's claim to a fence-free road.

*Id*. at 944 (emphasis added).

Here, the United States has not withdrawn any of its statute of limitations arguments,[4] which fail even under pre-*Wilkins* standards, but it also argues that Plaintiffs filed suit before there was any case or controversy to give the Court jurisdiction. It is wholly improper for the United States to argue both that Plaintiffs filed too early and too late. As shown below, the United States' irreconcilably inconsistent arguments are wrong on both counts.

---

[4]  Defendant United States' Notice of Supplemental Authority, ECF 762.

The QTA is a waiver of the United States' sovereign immunity and Congress can establish the conditions of the waiver. "[I]n our constitutional order Congress has (for better or worse) much discretion to decide when and under what conditions to waive sovereign immunity." *George*, 672 F.3d at 945.

### 2.  The Quiet Title Act's Waiver Of Sovereign Immunity.

Because the QTA involves a congressional waiver of sovereign immunity, some of Utah's traditional quiet title jurisprudence regarding the inapplicability of statutes of limitations in true quiet title actions does not hold sway. *See* Mem. Dec. at 3 (discussing *In re Hoopiiana Trust*, 2006 UT 53, 144 P.3d 1129, and *WDIS, LLC v. Hi-Country Estates Homeowners Assoc.*, 2019 UT 45, 449 P.3d 171).[5]

The QTA's waiver of sovereign immunity does not require a "range war." *George*, 672 F.3d at 946. A lawsuit "isn't triggered only when the government *acts* to enforce its claim — by tearing down a fence, issuing a citation, or the like. As we've already explained, by its plain terms the QTA is triggered by the government's claim — by its assertion of 'some interest adverse' to the plaintiff or her predecessor." *Id.*, citing *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980). "Our precedent does not allow plaintiffs to wait until the adverse claims of the title asserted by them and the United States crystallize into well-defined and open disagreements before commencing a quiet-title action." *Id.* at 946-47 (citation omitted).

---

[5] Nevertheless, Plaintiffs agree with the Court that to the extent the United States seeks to engraft state law into this QTA suit, state law squarely holds that this true quiet title action is "not subject to a statute of limitations." Mem. Dec. at 3, quoting *In Re Hoopiiaina Trust*, 2006 UT 53, ¶ 28.

The QTA waives sovereign immunity by providing that the "United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a). The specific text enacted by Congress is very important. Congress did not require that the United States dispute title; it only required a title dispute involving property "in which the United States claims an interest." *Id*.

"Thus, for a court to have jurisdiction over a QTA claim, the plaintiff must establish that: (1) the United States 'claims an interest' in the property at issue; and (2) title to the property is 'disputed.'" *Kane Cnty. v. United States*, 772 F.3d 1205, 1210-11 (10th Cir. 2014), citing *Leisnoi, Inc. v. United States* (*Leisnoi II*), 267 F.3d 1019, 1023 (9th Cir. 2001).

### 3.  Plaintiffs Have Pleaded And Demonstrated An Express or Implicit Title Dispute Beyond A Cloud On Title.

The United States devotes significant briefing in an attempt to characterize Plaintiffs' claims as insufficient claims of a "cloud on title." "[I]t is now clear that Plaintiffs were incorrect to rely on a 'cloud on title' standard for disputed title, as *Kane (1)* explicitly rejects a "cloud on title" standard. US Br. at 9; *see also Id*. at 10-11 (same). In *Kane (1)*, the Tenth Circuit held:

> To the extent the Ninth Circuit still utilizes a 'cloud on title' standard, we would reject it as incompatible with the rule that conditions on a waiver of sovereign immunity are to be specifically observed. The 'cloud on title' standard provides little guidance to parties as to what constitutes a title dispute and could lead federal courts to issue advisory opinions. Instead, we hold that to satisfy the 'disputed title' element of the QTA, a plaintiff must show that the United States has either expressly disputed title or taken action that implicitly disputes it.

12

*Kane (I)*, 772 F.3d at 1212. "Concrete action by the United States is not required; '[a]ll that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's.'" *Id*. at 1215, quoting *Knapp,* 636 F.2d at 283.[6]

**Question 1. What is the proper definition of a "holder" of an R.S. 2477 right-of-way?**

The term "holder" arose as the common-law description of the owner of an interest in property, but some interest less than the fee simple. "Notwithstanding the fact that a lease is a present possessory interest in land, there is no question that as a nonfreehold estate it is a different species of interest from a freehold estate in fee simple." *Pac. Sw. Realty Co. v. Cty. of L.A.*, 820 P.2d 1046, 1051 (Cal. 1991). "It is for that reason that common parlance refers to the 'owner' of a freehold estate, encumbered or unencumbered, but to the 'holder' of a lease; the freeholder is seised of land, whereas the leaseholder is not." *Id*.

> A right-of-way, or easement, is an 'interest in land owned by another person, consisting in the right to use or control the land . . . for a specific limited purpose.' The land upon which the easement rests is referred to as the 'servient estate,' and the land benefitting from the easement (the easement holder's land) is called the 'dominant estate.'

---

[6] The Tenth Circuit will be called upon to address *Kane (1)*'s statement regarding a "cloud on title." The Tenth Circuit in *Knapp* held that whether "the interest claimed amounts to legal title in the United States is irrelevant *if it constitutes a cloud on the plaintiffs' title. Knapp*, 636 F.2d at 282. An appellate panel cannot overturn a prior panel decision as it is "bound by the earlier decision." *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom."). Thus, the panel in *Kane (1)* could not overturn *Knapp*. Moreover, other circuit court decisions confirm the congressional intent behind the QTA to allow claimants to remove clouds on title. "By reading the statute itself and performing the traditional exercise of attributing a rational purpose to the legislature, we can attribute to Congress a purpose of furnishing a means by which state governments can remove clouds on their title created by federal assertions of claims." *Alaska v. United States*, 201 F.3d 1154, 1161 (9th Cir. 2000).

*Metro. Water Dist. of Salt Lake & Sandy v. SHCH Alaska Tr.*, 2019 UT 62, ¶ 23, 452 P.3d 1158, 1165 (citations omitted; quotation marks original). Thus, a "holder" is the person or entity with current rights to use the land of an owner in a particular way. *See Judd v. Bowen*, 2017 UT App 56, ¶ 43, 397 P.3d 686, 700 (prescriptive easement holder); *Kinetica Partners, LLC v. United States DOI*, 505 F. Supp. 3d 653, 659 (S.D. Tex. 2020) (holders of pipeline rights-of-way); 30 C.F.R. § 250.1701 (holder of a right-of-way).

Significantly, the rights of a holder are protectable property interests, including from interference by third parties. "In general, an easement 'is a right to use another's land for special purposes . . . . [It] is a right in land rather than a mere privilege . . . . An easement is property.'" *Salt Lake City S. R.R. Co. v. State Tax Comm'n*, 1999 UT 90, ¶ 10, 987 P.2d 594, 597, quoting George W. Thompson, 2 Real Property § 315 (1980). "An easement holder has the right to use the designated land for specific purposes *and exclude others therefrom who would interfere with those purposes*." *Id.* (emphasis added).

"The grant of a right-of-way does, however, entitle the holder to use the premises at reasonable times and to maintain, improve, or repair the way to serve its purpose." *Wagner v. Doehring*, 553 A.2d 684, 687 (1989). A holder is entitled "to protection as against third persons from interference in such use or enjoyment [and] is not subject to the will of the possessor of the land." *Id.*, citing Restatement of Property § 450 (1944).

"The United States concurs that a 'holder' includes one who holds a vested property right, even if title has not been perfected[.]" US Br. at 11. The United States then argues that it "respectfully disagrees with the Court's statement, that, '[a]ccording to the United States,

14

Plaintiffs cannot be a 'holder' unless (1) title has been adjudicated by a court, or (2) the BLM has administratively determined the validity of an R.S. 2477 claim for its own purposes.'" *Id*.

The United States' argument lacks merit. Plaintiffs have recounted how, for years, the United States has expressly stated that Plaintiffs are not "holders" of R.S. 2477 rights-of-way— for purposes of regulation, maintenance, and improvement—unless and until proven in court. *See generally* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Amended Complaint, ECF 47.

**Question 2. If a "holder" includes one who holds a vested property right, even if title has not been perfected, does the act of refusing to consult on a road improvement, or the act of refusing to allow regular maintenance, constitute a denial that the State and County hold an R.S. 2477 right, so as to trigger the case or controversy requirement under the QTA?**

The United States' refusal to consult on road improvements is an example of the United States' express or implicit interference with, and denial of, Plaintiffs' title. Such direct interference stands on "different footing" (Mem. Dec. at 8), but is just one more way in which the United States has expressly or implicitly disputed Plaintiffs' title.

Three of the eight roads now at issue require much-needed improvements including the K9000 Hole-in-the-Rock Road. In 2005, the BLM refused to consult about a desperately needed resurfacing project because DOI will not acknowledge Plaintiffs' R.S. 2477 right-of-way. *See* Bellwether Trial Proposed Findings of Fact and Conclusions of Law, ECF 659 ("FOF"), pp. 323-24[7]; Pl. Ex. 552 (project description). Additionally, the United States refused to consult on needed improvements to the G9000 Hole in the Rock Road and K6000 House Rock Valley

---

[7] Plaintiffs' references are to the ECF page numbering.

Road. *See generally* Kane County, Utah, Garfield County, Utah, And The State Of Utah's

Motion For Relief, ECF 734 (United States denied existing title for all three roads).

      The United States' Rule 30(b)(6) witness, Mr. Kent Hoffman, confirmed that Plaintiffs

are not the holders of any R.S. 2477 rights-of-way, which would include the eight roads now at

issue. FOF, at 334-35. "The holder is none at this time." *Id*. at 335. The United States' express

and implicit denial of title, and continuing interference with Plaintiffs' right, title and interest in

their R.S. 2477 rights-of-way, created a case or controversy ripe for adjudication. "A dispute is

ripe when a conflict over the application of a legal provision has sharpened into an actual or

imminent clash of legal rights and obligations between the parties thereto." *Metro. Water Dist. of*

*Salt Lake & Sandy v. Sorf*, 2019 UT 23, ¶ 10, 445 P.3d 443, 445 (citation and quotation marks

omitted). "On the other hand, [a]n issue is not ripe for appeal if there exists no more than a

difference of opinion regarding the hypothetical application of a provision to a situation in which

the parties might, at some future time, find themselves." *Id*. (citation and quotation marks

omitted).

      *Sorf* involved an easement dispute regarding whether certain buildings interfered with the

rights of the easement owner. *Id*. at ¶¶ 4-5. The trial court had granted summary judgment to

defendant Sorf because "whether [Sorf] has violated [Metro's] easement rights or [Metro's]

*necessary* rules and regulations cannot be determined until such time as [Metro] has an actual

need to refurbish or replace the pipeline." *Id*. at ¶ 5 (alterations and emphasis in original).

      The Utah Supreme Court reversed the trial court on two grounds. First, even though there

was no present intent to alter the existing easement, the court held that "[w]hether Metro has the

regulatory authority it claims is, in part, determinative of whether it is entitled to injunctive relief

against Mr. Sorf." *Id*. at ¶ 11. "If Metro does have this authority, Mr. Sorf has violated valid Metro district regulations, and Metro may seek a remedy. So, the question of whether, and to what extent, Metro has the regulatory authority it claims is ripe for adjudication." *Id*. Second, the court held there was a "live dispute regarding whether Mr. Sorf's improvements have unreasonably interfered with Metro's property rights. Metro has established rights based on an express easement. If Mr. Sorf has infringed upon that easement, Metro has *a right to remedy that infringement*." *Id*. at ¶ 13 (emphasis added). "This is not a speculative inquiry." *Id*.

Here, there is an actual case-or-controversy ripe for resolution. Quieting title to Plaintiffs' rights-of-way will establish the respective governments' existing property rights and regulatory authority in a present, real-world decision. It will have immediate effect and will guide the expenditure of government funds immediately. Contrary to the United States' red-herring argument that some roads are open, so there is no case or controversy, "a plaintiff need not show the United States took direct action to close or deny access to a road—indirect action or assertions that actually *conflict* with a plaintiff's title will suffice." *Kane (I)*, 772 F.3d at 1212. "Nor is the United States shielded by sovereign immunity where it previously disputed a plaintiff's title but does not do so presently." *Id*.

**Question 3. If so, when was the statute of limitations triggered, if at all, for the remaining eight roads at issue?**

The United States argues that for the eight[8] "roads that are open to the general public, there is no actual dispute but only, at most, a mere cloud on title where the United States has

---

[8] Once again, the eight roads are the K1300 Elephant Cove; K4200 Kitchen Corral; K4500 Willis Creek; K8200 Sit Down Bench; K8600 Little Valley; K6000 House Rock Valley Road; K9000 Hole-in-the-Rock as it traverses Kane County; and G9000 Hole-in-the-Rock as it traverses Garfield County.

17

failed to take any position on Plaintiffs' assertion of title." US Br. at 10. And yet the United States admits that several of the eight roads have "existing restrictions." US Br. 10.[9]

### 1. Plaintiffs Have Shown A Justiciable Title Dispute Under The Quiet Title Act.

The extensive record before the Court recites a long list of United States officials and attorneys expressly disputing Plaintiffs' title, including by statements that Plaintiffs have no right, title or interest in any R.S. 2477 right-of-way "unless and until" proven in court. *See generally* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Amended Complaint, ECF 47. "DOI solicitors and Federal land managers have decided that Kane County has no right, title or interest in its public highways crossing federal land unless and until Kane County's rights-of-way are adjudicated in court." *Id*. at 27.[10]

As reported in *Kane County, et al. v. Salazar*, 562 F.3d 1077 (10th Cir. 2009), the United States won dismissal of Kane County's and Garfield County's 2005 lawsuit against the Grand Staircase-Escalante National Monument ("Monument") transportation plan on the premise that an Administrative Procedure Act ("APA") lawsuit "does not waive sovereign immunity for the adjudication of claims that are premised upon the assertion of unproven property interests in federal land." *Id*. at 1083. The United States and the Southern Utah Wilderness Alliance won dismissal because Kane County and Garfield County must sue "under the Quiet Title Act." *Id*. The *Salazar* decision directly involved seven of the eight roads identified by the Court for supplemental briefing, the K1300 Elephant Cove Road being the lone exception.

---

[9] As shown above, in 1996 Congress prohibited DOI's management or restriction of *any* of Plaintiffs' R.S. 2477 rights-of-way. Pl. Ex. 409.

[10] The evidence and briefing supporting the continuing title dispute are too extensive to recount in this response brief.

As reported in *Wilderness Soc'y v. Kane County*, 632 F.3d 1162 (10th Cir. 2011), several environmental groups sued Kane County in 2005 for adopting an Off-Highway Vehicle Ordinance regulating the types of vehicles that could travel on Kane County's roads. This lawsuit included seven of the eight roads involved in this briefing (the Garfield County segment of the Hole-in-the-Rock Road being the exception). The Wilderness Society sued Kane County on the premise that the county could not manage its roads on federal lands "unless and until Kane County proves in a court of law that it possesses a right-of-way to any" of its roads. *Id*. at 1167.

Before filing this lawsuit, Kane County and Garfield County were sued by the United States for trespass. *See generally SUWA*, 425 F.3d 735. In *Salazar* and the *Wilderness Soc'y*, Plaintiff's title was expressly disputed. Thus, there is a title dispute within the Court's jurisdiction under the QTA.

With respect to the G9000 Hole-in-the-Rock Road, Garfield County has shown that there is an existing title dispute. DOI has "engaged in an effort to impair or entirely deprive Plaintiffs and the public of their vested rights-of-way, and have sought to avoid DOI's duty to manage public lands subject to valid existing rights." Complaint to Quiet Title, ECF 2, Case No. 2:11-cv-01045 ("Garfield Complaint"), ¶ 96. "DOI solicitors and BLM managers have decided that Plaintiffs' have no right, title, or interest in these public highways crossing federal land *unless and until Plaintiffs' rights-of-way are adjudicated in court*." *Id*. at ¶ 97 (emphasis added). "Acting upon this position, BLM attorneys recently argued in court, and established, that the roads in this case are presumptively federal roads and that Plaintiffs have no right, title, or interest in the roads until Plaintiffs adjudicate their title." *Id*

19

"DOI officials have admitted that the DOI is regulating these roads as DOI roads, and that DOI is responsible for the roads until Plaintiffs' title is confirmed." *Id*. at ¶ 98. "The BLM, in particular, has refused to use its own funds to repair and maintain the roads, and has ignored the widespread public safety hazards directly caused by its recent claim to own the roads." *Id*.

The DOI has rejected the legal principles confirmed in *SUWA* (title vests by operation of law) and it requires "a DOI decision or court order" to establish title. *Id*. at ¶ 101. The "DOI and BLM have now imposed a competing scheme of motor vehicle travel regulations on Plaintiffs' roads in this suit and have ejected Garfield County from its lawful role as the public highway regulatory authority." *Id*. at ¶ 102.

"In 2005, the BLM State Director informed Garfield County that BLM would not recognize any Garfield County right-of-way on BLM administered lands and that Garfield County's actions broke the law." *Id*. at ¶ 126. *See also* Garfield Complaint, ¶¶ 128-156.

Additionally, the BLM is again working on new travel plans, under an improper settlement agreement that requires the BLM to consider restrictions on, or closures of roads (including State and County claimed R.S. 2477 rights-of-way in various Travel Management Areas, as well as in the Monument that will affect Plaintiffs' right, title and interest. As a result, Plaintiffs are yet again forced to try to protect their title as against new federal travel plans and the inevitable litigation. *See generally* Supplemental Complaint, ECF 395.

## 2.  Plaintiffs Timely Filed Their Lawsuits Within The Quiet Title Act's Statute of Limitations.

As noted above, the Supreme Court's recent decision in *Wilkins* effectively overturned 40 years of QTA statute of limitations jurisprudence and the impact of *Wilkins* will surely be litigated for years to come. Given the legal uncertainty, Plaintiffs cannot definitively identify a

specific event that "triggered" the QTA's statute of limitations. The QTA statute of limitations is an issue for the United States to pursue.

Nevertheless, Plaintiffs carefully marked certain events as potential triggers of the statute of limitations to ensure that their lawsuits were timely filed. These events include the February 2000 effective date of the Monument Transportation Plan. Def. Ex. 1083. Plaintiffs further noted the series of events disputing title commencing in 2005 when: 1) the United States argued in court that Plaintiffs have no right, title or interest in any R.S. 2477 right-of-way unless and until proven in court; 2) several BLM officials informed Kane County that it could not post road signs on its roads; 3) Park Service officials informed Kane County that it could not regulate motor vehicle travel on roads in the Glen Canyon National Recreation Area (the K9000 Hole-in-the-Rock and K8200 Sit Down Bench roads); and 4) the Wilderness Society's lawsuit that directly disputed Kane County's title.

Subsequently, the BLM expressly or implicitly disputed Plaintiffs' title in adopting BLM transportation plans in 2008, and later entering into an improper settlement agreement with SUWA (and other environmental groups) that refused to protect Plaintiffs' R.S. 2477 rights-of-way in all Travel Management Plans being reviewed throughout the State of Utah.

This continuing title dispute will only end upon the court's decree quieting title. If title is quieted in Plaintiffs, they will maintain, repair, and regulate their R.S. 2477 rights-of-way and they will be spared the continuous litigation and endless revisions to federal transportation planning. There is an existing case or controversy under the QTA and the Court's decree quieting title to Plaintiffs' roads will have immediate effect.

DATED this 15th day of December, 2023.

HOLLAND & HART LLP

*/s/ Shawn Welch*
Shawn T. Welch
Richard D. Flint
Michelle L. Quist
*Attorneys for Plaintiff Kane County, Utah*


UTAH ATTORNEY GENERAL'S OFFICE

*/s/ Kathy A.F. Davis\**
Kathy A.F. Davis
Kaitlin Tess Davis
Assistant Attorneys General
*Attorneys for Plaintiff State of Utah*

*\* Signed with permission given to filing counsel*

31011818_v1