IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KANE COUNTY, UTAH (2), (3) and (4), a Utah political subdivision; and STATE OF UTAH, <br><br>      Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br>      Defendant, <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, et al., <br><br>      Permissive Intervenor-Defendants. | **MEMORANDUM DECISION AND ORDER RE: MOTIONS TO DISMISS AND DEFINITION OF A "HOLDER"** <br><br> Case No. 2:10-cv-1073 <br> *Consolidated with*:  2:11-cv-1031 <br>                 2:12-cv-476 <br><br> Case No. 2:11-cv-1045 |
| GARFIELD COUNTY (1) AND (2), a Utah political subdivision; and STATE OF UTAH, <br><br>      Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br>      Defendant, <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, et al., <br><br>      Permissive Intervenor-Defendants. | Judge Clark Waddoups |

## INTRODUCTION

In 2012, the State of Utah and certain counties filed actions to quiet title to approximately 12,000 roads across Utah, pursuant to R.S. 2477.[1]  When those actions were filed, Kane County already was immersed in an R.S. 2477 action filed in 2008 and this action that was filed in 2010. Knowing litigation of all 12,000 roads was improbable based on the sheer length of time and effort such a feat would take, it was decided that this case would proceed as a Bellwether process.  Under the Bellwether process, fifteen roads were selected to test various scenarios.  Those scenarios, along with the scenarios from another Bellwether case involving Garfield County, are then to be applied to help resolve the remaining 12,000 road claims.  At least that was what was intended when the Bellwether process was established.

The United States' approach to the Bellwether process, however, has been for all Bellwether claims to be dismissed on jurisdictional grounds, on a seven year statute of limitations ground, and/or on a twelve year statute of limitations ground.  If the United States can obtain dismissal of the Bellwether claims under that combination of arguments, it can then seek dismissal of all 12,000 claims, the second Bellwether process will be unnecessary, and title to the roads will remain unresolved.  While the United States has a right to defend against Plaintiffs' claims, when a good faith dispute exists, the United States' arguments and actions as to R.S. 2477 property rights go too far and do not support dismissal.  The court therefore denies the United States' motions to dismiss, except as to the K1410 road.

---

[1]  Congress passed a law in 1866 entitled "An Act Granting Right of Way to Ditch and Canal Owners Over The Public Lands, and For Other Purposes," which is more commonly "known as the Mining Act of 1866."  59 Fed. Reg. 39216, 39216 (Aug. 1, 1994).  "In 1873, Section 8" of that act "was codified as Section 2477 of the Revised Statutes, hence the reference as R.S. 2477."  *Id.*

<u>ANALYSIS</u>

I.     **THE IMPORTANCE OF STATE AND LOCAL TRANSPORTATION SYSTEMS**

In 2005, the Tenth Circuit had an R.S. 2477 case before it where it had to address "the definition of R.S. 2477 rights of way across federal land" and the scope of rights encompassed under that statute. *SUWA v. BLM*, 425 F.3d 735, 742 (10th Cir. 2005) (hereinafter "*SUWA Decision*"). The BLM and environmental groups argued that R.S. 2477 should not be interpreted too loosely, otherwise "every path, vehicle track, or dry wash in southern Utah" potentially would become a "route for cars, jeeps, or off-road vehicles." *Id.*

In contrast, because "most of the transportation routes of the West were established under" R.S. 2477, the counties asserted western states rely upon R.S. 2477 rights of way as "major components of [their] transportation systems." *Id.* at 740, 742; *see also Sierra Club v. Hodel*, 848 F.2d 1068, 1082 (10th Cir. 1988) *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992)[2] (stating R.S. 2477 "roads are major components of the transportation systems in most western states"). The counties "express[ed] the fear that the federal land managers and conservationists are attempting to redefine [R.S. 2477] rights out of existence, with serious financial and other impacts on the people of Utah." *Id.* (quotations and citation omitted). The counties' concerns have never varied over the past nineteen years, and it appears their fears are well-grounded.

The State and counties depend upon their transportation systems for economic viability. *See The Evolution of Fed. Pub. Land & Res. Law in the 21st Century*, 2017 No. 1 RMMLF-Inst 1,

---

[2]  When citing to *Sierra Club v. Hodel* subsequently in this decision, the court omits the reference to that part of the decision which was overruled on grounds not relevant to this case.

1-4 (noting economic growth and corresponding "demand for access to public lands to support an ever-changing array of recreational uses").  Tourism is encouraged and made possible due to state and county transportations systems.  *See id.* (noting tourism "support[s] economic and job growth").  Visitors and residents are able to access remote locations for recreational activities, sight-seeing, hunting, and other activities via state and county transportation systems.

Utah's transportation systems, however, stand on a different footing than the transportation systems of most other states.  This is so because the United States owns 63.1 percent of the land in Utah, which percentage is second only to Nevada.  Congressional Research Services, *Fed. Land Ownership: Overview & Data*, at 8 (Feb. 21, 2020).[3]  That percentage translates into the United States owning over 33 million acres of the approximately 53 million acres of land within Utah's boundaries.  *Id.*  In contrast, the United States only owns a sum total of 4.1 percent of the land across 38 other states in the union.  *Id.* at Summary Page.  Boiled down, if the United States were to be successful in effectively terminating R.S. 2477 rights of way across its land in Utah, then the State and counties would lose their transportation systems across almost two-thirds of Utah and the corresponding financial benefits for the communities because the United States will have full control over access to land.

How the United States has addressed R.S. 2477 roads in Utah is different from how it has addressed the same type of roads in states with little federal land.  Take for example North Dakota, where the United States only owns 3.9 percent of the land within that state.  *Id.* at 8.  When faced with R.S. 2477 claims in North Dakota, the United States disclaimed any adverse interest in various

---

[3]  For this reference, pagination refers to the numbering on the bottom-right of the document.

roads, thereby recognizing the counties' claim to title. *N. Dakota. ex rel. Stenehjem v. United States*, No. 1:12-cv-125, 2020 U.S. Dist. LEXIS 182712, at *4 (D.N.D. Oct. 2, 2020), *aff'd sub nom. N. Dakota, ex rel. Wrigley v. United States*, 31 F.4th 1032 (8th Cir. 2022). Stated differently, the United States elected not to fight every claim the counties asserted. *Id.* Instead, the United States took a measured approach and challenged only certain claims.[4] *Id.* at *3–4.

In Utah, the United States has not disclaimed or acknowledged a single R.S. 2477 road among the 12,000 roads that are presently claimed. This is so despite recognizing there are some "routes which are *undoubtedly* County roads." BLM State Director Lttr., at 1 (Pls. Ex. 617)[5] (emphasis added). The United States is pursuing full control of the transportation systems across federal land in Utah. Its motions to dismiss apply only to the Bellwether roads, but the arguments are designed to establish a framework for dismissal of all R.S. 2477 road claims in Utah. The United States' framework consists of a combination of jurisdictional and statute of limitations arguments.

To carry out its jurisdictional position, the United States has developed a three-part course of action. Part One of its course of action partially appeared in a prior case, but it has since emerged in full in this case. As to roads that are open to motor vehicle use, the United States neither affirms nor denies that Plaintiffs are the title holders for those roads. It then contends there is no dispute as to title and no jurisdiction because sovereign immunity has not been waived for those roads.

---

[4] This court notes that the counties involved in the case likewise "filed a statement withdrawing their claims to" a road. *N. Dakota ex rel. Stenehjem*, 2020 U.S. Dist. LEXIS 182712, at *4.

[5] Unless otherwise noted, when citing to a page in the record, the court is referring to the ECF pagination at the top of the page.

Part Two of the United States' course of action involves the United States treating Plaintiffs as though they are not the title holders of R.S. 2477 rights-of-way because Plaintiffs' title has not been adjudicated by a court of law.  Thus, for the same roads that the United States is contending there are no title disputes, the United States disregards Plaintiffs as R.S. 2477 holders and treats them as non-holders.  Part Three completes the course of action where, because the United States will not treat Plaintiffs as R.S. 2477 holders unless title has been adjudicated, it informs Plaintiffs road improvements may only be done under a Title V permit.  That then gives the United States authority over roads it would not otherwise legally have were Plaintiffs' R.S. 2477 rights respected.  The United States' course of action is directed at the major roads in the State and counties' transportation systems.

The court turns now to the eight Bellwether roads challenged based on jurisdiction and a more complete discussion about Parts One and Two of the United States' course of action.  The court will address Part Three of the course of action in Section V.C. below when it addresses whether the United States' actions constitute a disputed title.  After addressing the United States' jurisdictional arguments, the court will then address whether Plaintiffs have pled their claims with sufficient specificity and the United States' statute of limitations arguments.

## II.     THE UNITED STATES' COURSE OF ACTION

### A.     The Eight Jurisdictional Roads

The United States challenges jurisdiction for eight of the Bellwether roads.  The initial Bellwether process pertained to fifteen roads, but two additional roads were added after Kane and Garfield Counties (the "Counties") asked for a more expeditious title resolution for the two roads due to their alleged unsafe travel conditions.  Reports have been made about livestock dying during

transport due to one road's condition and about vehicles being damaged.  Garfield Cnty. Lttr., at 4 (ECF No. 734-1).  For the other road, reports have been made about response teams needing to be deployed over vehicles becoming stuck due to the road's condition.  Kane Cnty. Lttr., at 2 (ECF No. 734-3).  Because title has been in limbo, it impacts how maintenance and repair responsibilities are carried out; hence the disrepair of the roads.  The United States seeks to leave title unresolved for eight of the seventeen roads by asserting a jurisdictional challenge and not disclaiming title.

The eight roads are: K1300 Elephant Cove; K4200 Kitchen Corral; K4500 Willis Creek; K8200 Sit Down Bench; K8600 Little Valley; K6000 House Rock Valley Road; K9000 Hole-in-the-Rock Road as it traverses Kane County; and G9000 Hole-in-the-Rock Road as it traverses Garfield County (the "Jurisdictional Roads").  All eight of the Jurisdictional Roads are open to public use via motorized vehicles under the United States' travel management plans.  Five of the eight Jurisdictional Roads are Class B roads in whole or in part,[6] which classification refers to roads that a county constructs and maintains "using funds made available for that purpose."  Utah Code Ann. § 72-3-103(5) (2020).

Class B roads are documented, county by county, on General Highway Maps.  Kane County General Highway Maps were published for the years 1937, 1950, 1956, 1961, 1965, and

---

[6]  The five roads are K1300 Elephant Cove, K4200 Kitchen Corral, K6000 House Rock Valley Road, K9000 Hole-in-the Rock Road, and G9000 Hole-in-the Rock Road.  K1300 Elephant Cove is a Class B road only for part of its length, and a Class D for other parts.  The K4200 Kitchen Corral's entire length is designated as a Class B road presently, but only a portion of it was designated as a Class B road prior to 1976.  *See* General Hwy. Map from 1975 (Pls. Ex. 181, at 3). Nevertheless, whether a road is a Class B road for its entire length does not impact the jurisdictional analysis.  Each road in this case is identified by name and number, and if any portion of the claimed road is disputed, title to that road is in dispute.  *San Juan County, Utah v. United States*, 754 F.3d 787, 795 (10th Cir. 2014) (stating "the county is master of its own claim" and may plead and define a road as it desires).

1975.  Each of the five Class B roads appeared on one or more of those General Highway Maps prior to 1976, as a designated Class B road, and was maintained by Kane County prior to 1976.[7] The year 1976 is important because title to an R.S. 2477 road had to vest prior to October 21, 1976, for it to be an R.S. 2477 road.  Notably, the Kane County General Highway Map for 1937 states it was "prepared by the Utah State Road Commission in cooperation with the U.S. Department of Agriculture, Bureau of Public Roads."   1937 Gen. Hwy. Map, at 1 (Pls. Ex. 175).  The remaining maps have similar notations, although the names of the particular state and federal agencies involved changed over the years.  *See* Gen. Hwy. Maps (Pls. Exs. 175–78, 180–81).  What did not change was that each General Highway Map was prepared in cooperation with the federal government.

---

[7]  For K1300 Elephant Cove, *see* General Highway Maps from 1950, 1956, 1961, 1965, and 1975 (Pls. Exs. 176–78, 180, and 181); *see also* Pls. Ex. 371, at 164, Pls. Ex. 871, at 146–47, and Pls. Ex. 873, at 509–512 (referencing maintenance of Class B section of Elephant Cove, also known as the Barricks Road); Trial Tr., at 1365, 1367 (B. Harris) (testifying about ongoing maintenance).

For K4200 Kitchen Corral, *see* General Highway Maps from 1950, 1956, 1961, 1965, and 1975 (Pls. Exs. 176–78, 180, and 181); *see also* Pls. Ex. 874, at 675–78 (referencing maintenance of Kitchen Corral Class B section prior to 1976);

For K6000 House Rock Valley Road, *see* Kane Cnty. Am. Compl., ¶¶ 1591, 1593–94 (ECF No. 21) (citing to road first appearing on the Kane County General Highway Map in 1950 and being maintained thereafter).

For K9000 Hole-in-the-Rock Road, *see* General Highway Maps from 1937, 1950, 1956, 1961, 1965, and 1975 (Pls. Exs. 175–78, 180, and 181); *see also* Pls. Ex. 371, at 4, Pls. Ex. 871, at 33–36 (referencing maintenance of Hole-in-the-Rock Road, also known as the Desert road).

For G9000 Hole-in-the-Rock Road, *see* Garfield Cnty. Compl., ¶¶ 764–65, 767–68 (ECF No. 2) (citing to road first appearing on the Garfield County General Highway Map in 1937 and being maintained thereafter).

Because the State provides funding to counties to help maintain Class B roads, significant efforts are made by the State to inspect, inventory, record, and map Class B roads based on data obtained during field visits. The General Highway Maps for each county were and are developed from these field visits, including the Kane County General Highway Maps identified above.

At trial in this case, a retired State employee testified about how he and others from the State conducted field visits during the 1960s and 1970s. Trial Tr., at 16–18, 24, 32 (C. Theobald). Class B roads were maintained to the level that a two-wheel drive passenger vehicle may navigate them. *Id.* at 25–26.[8] To ensure the roads were being maintained to the proper standard, the State drove the Class B roads "in a touring car" during the field visits *Id.* at 19, 25–26. Due to a road's condition, one could tell if the road was being maintained by the county, and the State also asked "the county representative" about its maintenance. *Id.* at 27. If a Class B road fell into disrepair, the State reclassified "it as a primitive road" on the map, and stopped funding unless the county resumed maintenance of the road. *Id.* at 28. Thus, if a road was on a General Highway Map as a Class B road versus a primitive road, it was because it was being maintained by the county.

Besides ensuring the roads were being maintained, the purpose of the field visits also was to ensure an accurate inventory of the roads and to map and record any changes. *Id.* at 18, 21–23. The State worked cooperatively with the respective counties and had either "a road grader operator" or a county commissioner ride along to help confirm and update the inventory of the Class B roads. *Id.* at 21–22. In the early 1970s, the State started "experimenting with using aircraft

---

[8] All citations to the trial transcript in this case refer to the consecutive numbering across transcript volumes. Sometimes the numbering is at the top of the page and sometimes it is at the bottom of the page. None of the pincites refer to the ECF numbering at the top of the page.

to fly . . . some of the [remote] county roads." *Id.* at 32.  If the State saw a new road from the air, it "would send in a ground crew" to gather information.  *Id.* at 34.  Most inventories, though, continued to be conducted on the ground.  *Id.*  The State did this for every county in the State, which took about three to "five years to make a complete cycle." *Id.* at 20–21, 24, 33.  The State then developed new highway maps from those field visits, with the county staying involved throughout the process.[9]  *Id.* at 22–23; *see also id.* at 39–41 (discussing how witness helped create the 1965 Kane County General Highway Map).  Through these procedures, the Class B roads, including the five Class B roads at issue in this decision, were well-known prior to October 21, 1976.

The remaining three Jurisdictional Roads are Class D roads, which are routes that are "maintained to provide for usage by the public for vehicles with four or more wheels."  Utah Code Ann. § 72-3-105(1) (2020).  Such maintenance is not to the standard of a Class B road where the road is maintained end to end.  Trial Tr., at 1354 (B. Harris); Trial Tr., at 1933 (L. Pratt).  If a certain location on a Class D road needs repair, such as when a wash out occurs, then the road is repaired to keep it in working order for motor vehicle use.  Trial Tr., at 1354–55 (B. Harris).  While the BLM has closed a number of Class D roads, those are not the roads at issue under the United States' jurisdictional challenge.  Indeed, there is no dispute that the three Class D roads and the five Class B roads, under the United States' jurisdictional challenge, are open for use by the public and motor vehicles.  The roads have existed since before October 21, 1976, and are well-defined roads on the ground and on maps.

---

[9]   Kane County's General Highway Maps were multi-page documents.  *See, e.g.*, Pls. Ex. 180 (mapping Kane County across four pages).

Due to the open status of the Jurisdictional Roads, the United States contends there is no disputed title. The issue is not the open status of the roads. The issue is how property rights are being treated despite the status of the roads. Whether such treatment is proper may only be determined by understanding congressional intent and the limitations on the United States' authority.

**B.**    **The United States Asserts No Disputed Title Exists for the Jurisdictional Roads**

"[A] range war isn't necessary to start the Quiet Title Act's limitation clock," *George v. United States*, 672 F.3d 942, 946 (10th Cir. 2012), and give rise to a title dispute. A battle nevertheless is at hand over who will manage and control the roads in Kane and Garfield Counties (the "Bellwether Counties"). The United States does not want title perfected in Plaintiffs' favor. If it did, the United States would disclaim its interests in the Jurisdictional Roads. Instead, in an effort to prevail, the United States has pursued a course of action to shut the courthouse doors to Plaintiffs seeking to perfect title to roads that are key to Plaintiffs' transportation systems.

Under Part One of the United States' course of action, it neither affirms nor denies the State and Bellwether Counties' title claims to the eight Jurisdictional Roads. The United States then uses that stance to seek dismissal of the claims pertaining to major roads because it asserts there is no disputed title. The United States was successful with this approach in a prior R.S. 2477 case. *Kane County, Utah v. United States*, 772 F.3d 1205 (10th Cir. 2014) (hereinafter "*Kane County (I)*"), *abrogated on other grounds by Wilkins v. United States*, 598 U.S. 152 (2023). The Tenth Circuit dismissed several R.S. 2477 claims to major roads because it concluded there was no dispute over title, especially since the roads were open to public use and the United States'

management plans said the plans did not "affect valid existing rights." *Id.* at 1212–13 (quotations and citation omitted).

Nevertheless, even under such circumstances, the State and Bellwether Counties' rights are still being harmed. This is evident when one views Part One and Part Two of the United States' course of action together. Part Two involves the United States setting parameters on when it will treat one as a holder of an R.S. 2477 right-of-way. Those parameters are not for the United States to set, but in so doing, the United States has placed itself in a management position over the transportation system in the Bellwether Counties.

### C.      The United States' Disregard of Plaintiffs as "Holders"

Under Part Two of the United States' course of action, it disregards Plaintiffs as holders of any R.S. 2477 rights absent adjudication by a court, which in turn denies Plaintiffs their rights as holders. The rights of an R.S. 2477 holder are extensive. They include management of R.S. 2477 rights-of-way and all rights attendant to that.[10] An R.S. 2477 right-of-way is a property right, well-established by history. The United States' position is contrary to this history and R.S. 2477 property rights.

### i.      United States' Position on a Holder of an R.S. 2477 Right-of-Way

For 110 years, the United States invited the public and local communities to develop R.S. 2477 roads over federal lands as part of the United States' goal to settle the west. The invitation consisted of the following few words: "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8,

---

[10]     The court discusses the breadth of an R.S. 2477 holder's rights in more detail in Section III below.

14 Stat. 251, 253.  By offering a self-executing grant, with no formalities attached, the United

States made clear that it wanted the state, counties, and the public to accept the grant.  "Roads were

deemed a good thing."  *SUWA Decision*, 425 F.3d at 741.  They "'tend[ed] to increase the value

of the public lands, and for this reason [were] favored.'"  *Id.* (quoting *Flint & P.M. Ry. Co. v.

Gordon*, 41 Mich. 420, 2 N.W. 648, 653 (1879)).

After the United States accomplished its goal of western land development, the United

States turned its focus to conservation of its land.  It repealed R.S. 2477 on October 21, 1976, and

passed legislation where no new roads may be established across federal land without the United

States' permission.  Fed. Land Pol'y & Mgmt. Act of 1976, Pub. L. No. 94–579, §§ 501, 706(a),

90 Stat. 2743 (1976).  Nevertheless, that repeal did not write existing R.S. 2477 roads out of

existence.  Congress did quite the contrary by expressly stating, "[n]othing in this Act, or in any

amendment made by this Act, shall be construed as terminating any valid . . . right-of-way, or other

land use right or authorization existing on the date of approval of this Act."  *Id.* § 701(a).

Per Congress, R.S. 2477 roads existing at the time of the statute's repeal remained R.S.

2477 roads.  When one considers the amount of effort expended to inventory, record, and maintain

Class B roads, it was and is not a small endeavor by the State and local governments.  The State

and local governments showed their acceptance of the grant by those actions.  Thus, such roads

did not have the status on October 20, 1976 of being an R.S. 2477 road under the control of state

and local governments only to the lose that status the following day when R.S. 2477 was repealed.

The same is true for Class D roads where acceptance of the grant had occurred.  If the State and

counties were managing an R.S. 2477 road when the Federal Land Policy and Management Act of

1976 ("FLPMA") was passed, FLPMA was not intended to alter that role.  After all, R.S. 2477 roads are a property right and property rights are protected by law.

The United States acknowledges "that a 'holder' includes one who holds a vested property right, even if title has *not* been perfected."[11]  U.S. Supplemental Brief in Supp. of Mot. to Dismiss, at 3 (ECF No. 776) (emphasis added) (quotations, citation, and alteration omitted).  Although the United States recognizes that title does not have to be perfected for one to be a holder of an R.S. 2477 property right, the United States continues to interfere with one's holder status unless title is perfected.  The United States attempts to justify its position by asserting it is inaccurate to state the United States has denied Plaintiffs are holders "unless (1) title has been adjudicated by a court, or (2) the BLM has administratively determined the validity of an R.S. 2477 claim for its own purposes."  *Id.* at 3.  Instead, the United States clarifies its "point was (and is) simply that when confronted with an asserted holder, the United States need not accept the assertion unless one of those identified events has occurred."  *Id.*

Put into practice, unless title has been judicially adjudicated or the BLM has made an administrative determination, the United States disregards Plaintiffs as an R.S. 2477 holder.  Thus, until one of those events has occurred, even if Plaintiffs actually are a holder, the United States treats Plaintiffs as a non-holder of the road, in interference with Plaintiffs' rights.  This is so even with major roads that clearly were in existence and being managed by the State and local governments on October 21, 1976.  By its course of action to shut the courthouse doors to

---

[11]  The United States further understands that "perfected" means "a scenario where a Plaintiff has established through evidence, in an appropriate [quiet title action], that a right-of-way was accepted."  U.S. Supplemental Brief in Supp. of Mot. to Dismiss, at 3 n.1 (ECF No. 776).

Plaintiffs, while simultaneously refusing to treat Plaintiffs as holders, the United States can effectively limit and defeat Plaintiffs' R.S. 2477 rights.

The United States confirmed its position during a Rule 30(b)(6) deposition that it will not treat one as a holder unless title is adjudicated by a court.  When asked who the holder was for any of the Bellwether roads, the United States responded, "[t]he holder is none at this time."  Pls. Ex. 890, at 66 (Hoffman Depo.).  The witness further testified that for Kane County to be a holder, it would require judicial adjudication or an administrative determination.  *Id.* at 66–67.  When asked again "what is required for Kane County to be a holder or the owner of a right-of-way for any of the bellwether roads," the United States responded there are two ways to become a holder: "through a judicial adjudication or through an administrative determination."  *Id.* at 91.  It contends its position is based on the *SUWA Decision*.  *Id.* at 93.  In keeping with that view, the United States asserted during the 30(b)(6) deposition that Kane County is not the controlling authority to regulate or maintain any of the Bellwether roads as Kane County highways.  *Id.* at 98–99.  Thus, the United States has set parameters on when Kane County and other counties may be recognized and treated as an R.S. 2477 holder, and it denies the Bellwether Counties have management authority over any of the Bellwether roads because the parameters set by the United States have not been met.

        ii.     Congressional Prohibition

The BLM and other federal agencies are banned from being the decisionmaker about R.S. 2477 rights.  A congressional ban arose when the Secretary of the Interior sought to "promulgate regulations addressing [R.S. 2477] rights-of-way . . . across lands now administered by the Bureau of Land Management, the National Park Service, and the U.S. Fish and Wildlife Service."  59 Fed. Reg. 39216, 39216 (Aug. 1, 1994).  The Department of the Interior ("DOI") wanted an

15

administrative process where it could make binding determinations about whether an R.S. 2477 road existed across federal lands. *Id.* It proposed a rule on August 1, 1994, that reportedly was "intended to clarify the meaning of the [R.S. 2477] statute and provide a workable administrative process and standards for recognizing valid claims." *Id.* Although the R.S. 2477 statute had been in place for 110 years, and federal regulations had long acknowledged during that time that no administrative process was required to establish an R.S. 2477 road,[12] the DOI's proposed regulations sought to change that through a new interpretation of the statute.

Congress put a stop to the DOI's efforts by passing legislation on September 30, 1996, that provides: "No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act." Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104–208, § 108, 110 Stat. 3009 (1996). Since 1996, Congress has not lifted that ban, nor authorized the DOI to issue final regulations pertaining to the recognition, management, or validity of R.S. 2477 claims. "The General Accounting Office has concluded that [Section 108] has the status of permanent law." *SUWA Decision*, 425 F.3d at 756 (citing GAO Opinion B-277719, at 1–5 (Aug. 20, 1997)).

---

[12] *See, e.g.*, 43 C.F.R. § 244.55 (1939) ("The grant [under R.S. 2477] becomes effective upon the construction or establishing of highways, in accordance with the States laws, over public lands not reserved for public uses. No application should be filed under act, as no action on the part of the Federal Government is necessary.").

iii.   <u>Caselaw Addressing the Scope and Impact of the Congressional Prohibition</u>

Although Congress banned federal agencies from promulgating final regulations without congressional approval, the United States subsequently attempted to make binding R.S. 2477 determinations through an informal process based on the prudential doctrine of primary jurisdiction. *SUWA Decision*, 425 F.3d at 743, 750. The issue arose in a suit filed only a few days after Congress passed the ban. On October 2, 1996, "SUWA filed suit against the BLM, San Juan County, and later Kane and Garfield Counties, alleging that the Counties had engaged in unlawful road construction activities and that the BLM had violated its duties under" various federal statutes by not taking action against the counties. Compl., Case No. 2:96-cv-836 (D. Utah Oct. 2, 1996); *SUWA*, 425 F.3d at 742. "The BLM filed cross-claims against the Counties, alleging that their road construction activities constituted trespass and degradation of federal property in violation of FLPMA," and "sought damages to cover the cost of rehabilitating the affected areas." *Id.* at 742–43.

"The district court acknowledged that the validity and scope of the claimed rights-of-way were the key to resolving the trespass claims," but it concluded the BLM had to make the initial determination of whether an activity fell within an established right-of-way. *Id.* at 743, 750 (quotations, citations, alteration omitted). "The BLM then conducted a thorough informal adjudication of the Counties' purported rights of way. It first issued an instructional memorandum describing the process it would use to determine the validity and scope of the Counties' asserted rights of way." *Id.* at 743. Those instructions set forth what "evidence the BLM was seeking," including evidence of construction, whether the lands were withdrawn, and whether the roads met the BLM's definition of a highway. *Id.* (quotations and citation omitted). Based on the parameters

the BLM had established, perhaps not surprisingly, the BLM concluded "fifteen of the sixteen" roads at issue failed to satisfy R.S. 2477 requirements, and that Kane County's roadwork "had exceeded the scope of its right of way for the sixteenth [road]." *Id.* The district court treated the counties' opposition to the BLM's determinations as an appeal and "affirmed the BLM's determinations in their entirety." *Id.* at 743–44.

The Tenth Circuit reversed on the ground that the district court had erred in treating the BLM's determinations "as a binding primary jurisdiction referral." *Id.* at 750, 757. Primary jurisdiction arises only when "Congress has, by statute, given authority over the issue to an administrative agency." *Id.* at 751. The BLM argued it had primary jurisdiction because Congress had granted the BLM "authority to execute the laws regulating the acquisition of rights in the public lands," and "that when Congress makes a grant of lands . . . the general statutory provisions giving the BLM authority over the public lands also give it authority over the grant." *Id.* at 751–52. The Tenth Circuit rejected the notion as applied to R.S. 2477 grants. *Id.* at 752.

The Court observed that Congress had "prohibit[ed] the Department of the Interior from issuing final rules governing R.S. 2477," and over the course of "139 years of practice under the statute," no "court has deferred to a binding determination by the BLM on an R.S. 2477 right of way." *Id.* at 756–57. While the BLM may elect to "determin[e] the validity of R.S. 2477 rights of way for its own purposes," the Tenth Circuit concluded it was an abuse of discretion for the trial court to defer to the BLM determinations on the sixteen roads in that case. *Id.* at 757.

In short, "R.S. 2477 creates no executive role for the BLM to play." *Id.* at 754, 757. The congressional ban and the Tenth Circuit's *SUWA Decision* foreclose the United States' efforts to put itself as the decisionmaker of whether its lands are encumbered by another's property rights.

18

This is true regardless of whether the United States attempts to make such determinations under final rulemaking or informal adjudications.

Yet, having failed to place itself as the decisionmaker by final rulemaking or informal adjudications, the United States has turned to doing so by policy. Because the United States expressly declines to take a position on whether Plaintiffs are title holders of the Jurisdictional Roads, in an attempt to defeat jurisdiction for lack of disputed title, yet has treated Plaintiffs as non-holders absent adjudication by a court of law, the United States will have accomplished by policy and practice what it cannot lawfully do. It not only has set forth a course of action for title never to be determined for the Jurisdictional Roads, but since it treats Plaintiffs as non-holders, the effect of the United States' policy is to divest Plaintiffs perpetually of any vested property right Plaintiffs may hold. Besides circumventing the congressional ban and caselaw, the United States' position on a "holder" is not in conformity with congressional intent and the R.S. 2477 grant. The court now turns to what that intent and grant entail.

### D. Congress Established a Unique Right When It Passed R.S. 2477

#### i. Vesting of a Property Right

"*Congress* established a very different system for R.S. 2477 rights of way." *SUWA Decision*, 425 F.3d at 754 (emphasis added). The establishment of an R.S. 2477 road was unique in nature due to how the grant vested property rights. "Unlike any other federal land statute of which [the Tenth Circuit is] aware, the establishment of R.S. 2477 rights of way required no administrative formalities; no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested." *Id.* at 741. The R.S. 2477 grant was self-executing and free flowing. *Sierra*

*Club v. Hodel*, 848 F.2d 1068, 1083 (10th Cir. 1988); *SUWA Decision*, 425 F.3d at 741 (noting Congress made "a standing offer of a free right of way over the public domain"). Simply stated, R.S. 2477 rights vested when "the road [was] formed, by user or otherwise," and all such vesting occurred on or before October 21, 1976. *SUWA Decision*, 425 F.3d at 760, 779 (determining how roads are formed).

Congress did not change the nature or scope of the R.S. 2477 grants upon R.S. 2477's repeal under FLPMA. Instead, Congress "explicitly preserved and protected R.S. 2477 rights of way in existence as of October 21, 1976, and . . . those rights have the *status* of vested real property rights." *Id.* at 760 (emphasis added). It is Congress who made these rules to carry out its intent both when R.S. 2477 was enacted and when it was repealed.

ii.   Passing of Title in an R.S. 2477 Right-of-Way

Vesting of the property right means that state or local governments are title owners of an R.S. 2477 right-of-way.[13] Indeed, the Tenth Circuit has stated, "[b]ecause there are no patents, *title* to [R.S. 2477] rights of way *passes* independently of any action or approval on the part of the BLM. All that is required . . . are acts on the part of the grantee sufficient to manifest an intent to accept the congressional offer." *SUWA Decision*, 425 F.3d at 754 (emphasis added). Such acts by the grantee do not contain "notice or filing requirements of any kind." *Id.* Thus, "R.S. 2477

---

[13] Title in this sense does not mean "fee simple ownership of a defined parcel of territory." *SUWA Decision*, 425 F.3d at 747. Instead, "it is an entitlement to use certain land in a particular way," where the owner of the right-of-way "and the holder of the servient estate are intended to exercise their respective rights and privileges in a spirit of mutual accommodation." *Id.* at 747–48 (quotations and citation omitted).

rights of way may have been established—and *legal title may have passed*—without the BLM ever

being aware of it." *Id.* (emphasis added).

Based on the above, it is important to recognize that title passes for an R.S. 2477 right-of-

way without any formal action, including without adjudication by a court. Consequently, a quiet

title action is unnecessary to pass title of an R.S. 2477 right-of-way to a state or local government;

a quiet title action only comes into play when a dispute exists about whether a claimed title actually

passed prior to October 21, 1976. *See* 28 U.S.C. § 2409a (stating "[t]he United States may be

named as a party defendant in a civil action under this section to adjudicate *a disputed title* to real

property in which the United States claims an interest") (emphasis added)).

     iii.   <u>Vested Title Versus Perfected Title</u>

The Utah Supreme Court has distinguished between title that has vested and title that has

been perfected. As explained by the Utah Supreme Court, the difference is as follows:

> [A] quiet title action, as its name connotes, is one to quiet an Existing
> title against an adverse or hostile claim of another and not one
> brought to Establish title. One seeking such equitable relief must
> allege title, entitlement to possession, and that the estate or interest
> claimed by others is adverse or hostile to the alleged claims of title
> or interest. Hence it is to be seen that the effect of a decree quieting
> title is not to Vest title but rather is to Perfect an existing title as
> against other claimants.

*State, By & Through Utah State Dep't of Soc. Servs. v. Santiago*, 590 P.2d 335, 337–38 (Utah

1979); *see also In re Hoopiiaina Trust*, 2006 UT 53, ¶ 26, 144 P.3d 1129, 1137 (stating "the effect

of a decree quieting title is not to *vest* title but rather is to *perfect* an existing title as against other

claimants") (quotations and citations omitted) (emphasis in original)); *Haynes Land & Livestock*

*Co. v. Jacob Fam. Chalk Creek, LLC*, 2010 UT App 112, ¶ 19, 233 P.3d 529, 535 (stating when

one brings a quiet title action, it is "to quiet an *existing* title against an adverse or hostile claim of another") (emphasis added) (quotations and citations omitted).

Similarly, the United States Supreme Court has stated the federal Quiet Title Act ("QTA") "does *not* purport to effectuate a transfer of title." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 291 (1983) (emphasis added). Nor does it "purport to strip any State, or anyone else for that matter, of any property rights," despite "[t]he statute limit[ing] the time in which a quiet title suit against the United States can be filed." *Id.* In other words, "[i]f a claimant has title to a disputed tract of land, he retains title even if his suit to quiet his title is deemed time-barred under § 2409a(f))."[14] *Id.* Moreover, "[a] dismissal pursuant to § 2409a(f) does *not* quiet title to the property *in the United States*. The title dispute remains unresolved." *Id.* (emphasis added). Had Congress divested one of title under the QTA, the United States Supreme Court opined it likely "would constitute a taking of the State's property without just compensation, in violation of the Fifth Amendment." *Id.* Thus, once title has vested, absent exercise of eminent domain, title remains with the title holder "regardless of whether [one's] suit to quiet its title is time-barred under § 2409a(f)." *Id.* at 291–92 & n.27.

*Block* shows that the Quiet Title Act merely perfects title. It does not vest or transfer title. The statute known as R.S. 2477 governs the conditions by which vesting of title occurred, and because nothing in the statute required a judicial adjudication for title to vest and pass to a state or local government, imposing that condition operates contrary to a state or local government's property right.

---

[14] Subsequent to *Block*, the QTA was amended and paragraph references were changed. Instead of § 2409a(f), the relevant paragraphs are now §§ 2409a(g) and (i) when dismissal is based on the statute of limitations.

iv.   FLPMA Did Not Alter Application of the 1866 Law

Imposing a new condition on an old statute is improper.  For example, in *Sierra Club v. Hodel*, the Sierra Club argued that FLPMA policies should apply when determining certain R.S. 2477 matters that arose prior to FLPMA, so there is uniformity.  *Sierra Club*, 848 F.2d at 1081. The Tenth Circuit rejected the argument.  In so doing, it stated, even though "FLPMA admittedly embodies a congressional intent to centralize and systematize the management of public lands," nevertheless, "[t]he policies supporting FLPMA . . . simply are not relevant to R.S. 2477's construction."  *Id.* at 1082.  Indeed, "[i]t is incongruous to determine the source of interpretative law for one statute based on the goals and policies of a separate statute conceived 110 years later. Rather, the need for uniformity should be assessed in terms of Congress' intent at the time of R.S. 2477's passage."  *Id.* (citation omitted). Because the "Sierra Club advance[d] no policies *from 1866* that would demand uniformity," the court rejected that state law should not apply when addressing certain R.S. 2477 matters.  *Id.* at 1082–83.

The Tenth Circuit is not alone in its holding that statutory interpretation is based on congressional intent at the time a statute is passed.  In 1983, the United States Supreme Court interpreted the meaning of a 1916 land grant by determining what Congress intended in 1916. Specifically, the Court stated the meaning of a land grant is "made in light of the use . . . that Congress contemplated."  *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 52 (1983).  The Court then reiterated "we interpret the language of the statute in a way that will further Congress' overriding objective" of the statute.  *Id.* at 56; *see also id.* at 62 (Powell, J., dissenting)  ("In construing a congressional act, the relevant intent of Congress is that existing at the time the statute was enacted.").

Applying these principles here, when interpreting who a "holder" is, how that status is applied, and the rights that flow from that status, the applicable view must be based on congressional intent in 1866 and not the present day. The United States' position runs afoul of these principles because it has imposed new requirements on when one is treated as an R.S. 2477 right-of-way holder. Despite the United States acknowledging that one can be a holder without title being perfected, it nevertheless requires title to be perfected before it will treat the State or counties as holders of any road. The United States' position is contrary to the self-executing grant that Congress established. It also is contrary to how the law was applied from 1866 to 1976. Indeed, the requirements the United States now imposes were not stated post-1976 until the 2000s.[15] Besides acting contrary to a congressional ban and caselaw, the United States has acted contrary to Congress' longstanding grant.

### E.     The Burden of Proof and Presumptions Do Not Require Dismissal

The United States has treated Plaintiffs as non-holders for all the Jurisdictional Roads. Its treatment arose prior to litigation. Its treatment is not a product of litigation. Yet, the United States contends it can treat one as a non-holder unless title is quieted because "a QTA plaintiff bears the burden of proving its asserted rights," and absent such proof, it is improper to presume the State and counties "hold vested rights under RS 2477." U.S. Supplemental Brief in Supp. of Mot. to Dismiss, at 4 n.2 (ECF No. 776). The United States asserts its position is supported by *Watt v. Western Nuclear, Inc.*, wherein the United States Supreme Court recognized "the established rule that land grants are construed favorably to the Government, that nothing passes except what is

---

[15]   The United States asserts its position is based on the *SUWA Decision*. Pls. Ex. 890, at 92–93 (Hoffman Depo.). That decision, however, does not state the United States may refuse to acknowledge the State or counties as an R.S. 2477 holder unless title is quieted.

conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *Id.* (citing *Watt*, 462 U.S. at 59) (quotations and citations omitted)).  The United States' contentions do not justify treating Plaintiffs as non-holders for the reasons stated below.

        i.      QTA Burden of Proof Requirements Are Not Applicable When Title Is Not in Dispute

      The United States' argument that, until title is quieted, it can refuse to treat Plaintiffs as an R.S. 2477 right-of-way holder because a QTA plaintiff bears the burden of proof, is flawed.  The United States seeks to apply the QTA's burden of proof outside of litigation, yet the burden only applies when there is litigation over disputed title.  If there is no dispute about title, then the burden of proof in a QTA action is inapplicable because there is no QTA action.  Treating Plaintiffs as non-holders because they have not met the burden of proof required in litigation is contrary to law.

      The *SUWA Decision* set forth the parameters of the statutory R.S. 2477 rights and how they vest.  Judge Michael W. McConnell was the author of the *SUWA Decision*.[16]  Four years after that decision, Judge McConnell expounded on the *SUWA Decision* when he dissented in the case of *The Wilderness Society v. Kane County, Utah*, 581 F.3d 1198 (10th Cir. 2009) (the "*Original TWS Case*").  He observed that "precious few" of the roads in "Utah or the West have ever been proven or established in court.  *That has never been necessary*.  For more than 150 years, R.S. 2477 routes have been regarded as vested property rights . . . ." *Id.* at 1226 (McConnell, J., dissenting) (emphasis added).  Were that property right to be reinterpreted, it would "wreak[] havoc with the transportation system of the West, to the detriment of federal as well as local interests." *Id.* at 1229.  He further stated that requiring a judicial adjudication before the State and counties may

---

[16]  Judge McConnell returned to academia in 2009 as a professor at Stanford Law School and Director of the Stanford Constitutional Law Center.

exercise their property rights "flies in the face of [the *SUWA Decision*], as well as with the decades of jurisprudence on which that decision rested." *Id.* at 1228.

Judge McConnell disagreed with how the divided panel addressed standing and the *SUWA Decision*. According to the panel, the *TWS Case* was pivotal. *The Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162, 1180 (10th Cir. 2011) (Lucero, J. dissenting) ("*En Banc TWS Case*"). Despite recognizing that "[p]erhaps some or all of the R.S. 2477 rights-of-way claimed by Kane County are valid," *id.*, the panel determined that Kane County still must have an adjudicated R.S. 2477 title before it may "exercise management authority over federal lands." *Original TWS Case*, 581 F.3d at 1205. To do otherwise, according to the panel, would mean "the United States' title to real property can be destroyed outside of a QTA claim." *En Banc TWS Case*, 632 F.3d at 1181. The panel also applied a broad interpretation of standing that allowed a third-party to challenge Kane County's authority to manage certain roads. *Original TWS Case*, 581 F.3d at 1214, 1217.

The panel decision did not stand. The Tenth Circuit, sitting en banc, vacated the panel's decision and remanded the case for dismissal due to lack of standing. *En Banc TWS Case*, 632 F.3d at 1174. It also addressed, however, the panel's interpretation of the *SUWA Decision* and whether a judicially adjudicated title was necessary before one could exercise R.S. 2477 rights. In doing so, it favorably cited to points made in Judge McConnell's dissenting opinion. *Id.* at 1173. Recognizing that "R.S. 2477 was a standing offer of a free right of way over the public domain," and that acceptance "occurred without formal action by public authorities," the en banc panel stated again, "[a]ll that is required for title to pass are acts on the part of the grantee sufficient to manifest an intent to accept the congressional offer." *Id.* at 1165.

26

The en banc panel opined that the two-panel decision "represent[ed] a broad shift in our caselaw," and cited a law review article "suggesting that the panel decision represents a shift in favor of the federal government and environmental plaintiffs over the interests of local government." *Id.* at 1172 (citing Lindsay Houseal, *Wilderness Society v. Kane County, Utah: A Welcome Change for the Tenth Circuit & Env't Groups*, 87 Denv. Univ. L. Rev. 725, 740–41 (2010)). That shift, according to the en banc panel, was "an anomaly given a legislative and administrative ordering scheme that expressly recognizes and defers to valid, *existing* R.S. 2477 rights." *Id.* at 1173 (emphasis in original). Existing rights have meaning and cannot be nullified merely because the federal government now wants full management control of its lands. Were that shift allowed, the en banc panel recognized it would have "implications for our cases and longstanding practice which has recognized R.S. 2477 rights and several other mechanisms for resolving such disputes." *Id.* (citing *Original TWS Case*, 581 F.3d at 1235–36 (McConnell, J., dissenting); *SUWA Decision*, 425 F.3d at 741)).

R.S. 2477 imposed no burden on the State and counties to prove to the United States their status as holders before the State and counties could exercise their rights. Those who were holders on October 20, 1976 continued to be holders when Congress passed FLPMA the following day. Congress made this clear. Congress also imposed no requirements on the State or counties to prove up their status before a court if they wanted to continue to be treated as holders. The *SUWA Decision*, the dissent in the *Original TWS Case*, and the *En Banc TWS Case* all show that, when there is no dispute about title, the United States cannot require adjudication by a court before one is treated as an R.S. 2477 holder. Again, "R.S. 2477 creates no executive role for the BLM to

play," *SUWA Decision*, 425 F.3d at 754, 757, and the United States lacks authority to disregard one's status as a holder based on invented parameters set by the DOI.

ii.    Holder Status Is Not Based on a Presumption

The court now addresses the United States' argument about presumptions.  The court concurs that a mere assertion of title is insufficient to afford one the status of a holder.  *Original TWS Case*, 581 F.3d at 1237 (McConnell, J., dissenting) (noting "that mere claims of rights-of-way are [not] tantamount to title").  Yet, that point is not relevant to this case because Plaintiffs are not basing their title as R.S. 2477 holders on mere assertions.  As stated by Judge McConnell, because an R.S. 2477 road "'could have come into existence without any judicial or other governmental declaration,'" then "if the route came into existence in the past and has not disappeared or been relinquished," presumably the road is a valid R.S. 2477 right-of-way. *Original TWS Case*, 581 F.3d at 1235 (McConnell, J., dissenting) (emphasis omitted) (quoting *San Juan Cnty. v. United States*, 503 F.3d 1163, 1168 (10th Cir. 2007) (en banc)).  This is so "despite the lack of any judicial declaration."  *Id.*

Here, the Jurisdictional Roads at issue are those open to motor vehicle use even under the BLM's travel management plans, and they have been in such use for over forty-eight years.  They are recognized roads on the ground and were recognized roads on the ground prior to October 21, 1976.  The Jurisdictional Roads mostly are major roads, and the Bellwether Counties have expended time and money to maintain each of them for public use.[17]  This is significant because,

---

[17]   As stated previously, Class B roads are maintained end to end.  Class D roads are maintained by doing repair work as needed to ensure motor vehicle traffic may continue on the road.

> When public funds have been spent on the road it shall be considered a public road. When the history of a road is unknown or questionable, its existence in a condition suitable for public use is evidence that construction sufficient to cause a grant under RS 2477 has taken place.

*Sierra Club v. Hodel*, 675 F. Supp. 594, 605 (D. Utah 1987) (quoting BLM Manual, Rel. 2-229, June 30, 1986); *see also* Pls. Ex. 564, at 4 (containing quoted excerpt of the BLM Manual cited in *Sierra Club*).

The United States claims the standard to be different.  It wants its policies implemented so it has control of the roads, not just the lands it manages.  But the State and Bellwether Counties have done all that was required by Congress, and unless the United States disputes title, it has an obligation to treat the State and Bellwether Counties in the same manner as it did prior to October 21, 1976, for the roads at issue.

### iv.   *Watt* Must Be Read in Light of Congressional Intent

Finally, as to the United States' argument that "land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it," the rule does not have a blanket application.  *Watt* pertained to a land grant that had exclusionary language where mineral rights were reserved to the United States.  *Watt*, 462 U.S. at 37.  The question presented was "whether gravel found on lands patented under the Act" constituted mineral rights that were "reserved to the United States."  *Id.* at 37–38.  The Supreme Court was interpreting the grant itself.  It was interpreting what the term "mineral" meant.  In that context, the Supreme Court resolved the ambiguous term in favor of the United States, so the grant did not exceed the intent of Congress.  *Id.* at 59–60.

Here, the United States is not arguing the language of the statute.  It is arguing what burden of proof must exist before it treats one as a holder of an R.S. 2477 right-of-way.  In terms of weight, not every interpretation of a congressional grant weighs in the United States' favor.  In 1979, the Supreme Court interpreted an act passed in 1862 to determine whether the land grant contained "an implied easement," in favor of the United States, such that the United States could "build a road across land" it had previously granted to a railroad company. *Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979).  The Supreme Court declined to recognize an implied easement, particularly when the grant contained express reservations but a reservation for an easement was not one of them. *Id.* at 678–79.

When the Court rejected the United States' argument, it acknowledged "the well-settled rule of this court that public grants are construed strictly against the grantees." *Id.* at 682 (quotations and citation omitted).  Nevertheless, it also stated that land grants "are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication. *Id.* at 682–83 (quotations and citations omitted).  The Supreme Court further stated, "[t]his Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power" related to the asserted easement. *Id.* at 687.

In this case, the United States' position would defeat the intent of Congress and withhold a vested property right.  The State and Bellwether Counties had settled expectations about R.S. 2477 grants and their rights under that statute.  Informing Plaintiffs that they will no longer be treated as R.S. 2477 holders, unless additional conditions are met, upsets settled expectations and is not in conformity with the R.S. 2477 grant or the United States' power under that grant.

The DOI has placed roadblocks to Plaintiffs' rights where none should be.  The BLM has acknowledged there are roads that *undoubtedly* belong to Kane County under R.S. 2477.  The Solicitor for the DOI stated during a congressional hearing the following: "If a highway is maintained by a county, there should be absolutely no problem with verifying that with very minimal evidence.  We have no desire to put the local governments through an elaborate paperwork requirement for *obvious* rights-of-way."  *To Recognize the Validity of Rights-of-Way Granted Under Section 2477 of the Revised Statutes, and for Other Purposes*: *Hearing on H.R. 2081 Before the Subcomm. on Nat'l Parks, Forests, & Lands of the H. Comm. on Resources*, 104 Cong., 1st Session, at 7 (July 27, 1995) (statement of John D. Leshy, Solicitor, U.S. Dept. of the Interior) (hereinafter "Leshy Statement to Congress") (emphasis added).  That statement was made twenty-nine years ago, but to this day, the United States treats Plaintiffs as non-holders on all roads absent judicial adjudication.  Judicial adjudication is far from the simple process that could and should have been present when addressing these roads since 1976.

### F.   Summarization of Holder Status

To summarize, a "holder" of an R.S. 2477 right-of-way is one in whom title vested and passed on or before October 21, 1976.  It is "one who holds an R.S. 2477 right-of-way."  U.S. Supplemental Brief in Supp. of Mot. to Dismiss, at 3 (ECF No. 776) (citing *SUWA Decision*, 425 F.3d at 745, 747–48) (other citation omitted).  Although title may be perfected through a quiet title action, one becomes a holder by mere vesting of title.  For one to be a holder, "no administrative formalities; no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested" are required.  *SUWA Decision*, 425 F.3d at 741; *see also* Leshy Statement to Congress, at 7 ("We

have kept no records under R.S. 2477 because there was no process ever created to keep records. In other words, there is no permitting requirement, no notice requirement, no requirement ever since 1866 to submit any of this information to the Government.").

In accordance with the congressional grant, if the State or counties regulated and managed a road prior to October 21, 1976, consistent with the status of being an R.S. 2477 holder, then the United States has an obligation to continue allowing the State and counties to exercise their vested property rights without interference, unless the United States disputes an R.S. 2477 title claim. This holding does not apply only to the Jurisdictional Roads. It is the law pertaining to the R.S. 2477 rights preserved by FLPMA and recognized by the Tenth Circuit. It is the rights of an R.S. 2477 holder that cannot be nullified by the DOI.

### G.    Limits on the Above Holding

The court's holding does not change the law as to disclaimers, the United States' discretionary authority, or the ability of the United States to dispute title at a future date. As for disclaimers, under 28 U.S.C. § 2409a(e), the United States may disclaim "all interest in the real property or interest therein . . . at any time prior to the actual commencement of the trial." A disclaimer is an affirmative act under the discretion of the United States. Although the United States asserts it has not disputed Plaintiffs' title for the Jurisdictional Roads, such inaction does not constitute a disclaimer of interest even if the United States were to treat Plaintiffs as holders.

Second, nothing in the court's decision alters the United States' discretionary authority to make an administrative, non-binding determination for its own purposes. Whether the United States elects to exercise or not exercise that authority does not have implications here.

32

Third, the QTA's statute of limitations provisions only apply to those seeking to sue the United States.  The statute of limitations does not apply to the United States.  "Courts have long held that the United States is not bound by any limitations period unless Congress explicitly directs otherwise."  *United States v. Alvarado*, 5 F.3d 1425, 1427 (11th Cir. 1993) (quotations and citation omitted); *see also United States v. Telluride Co.*, 146 F.3d 1241, 1244 (10th Cir. 1998) (quoting *E.I. Dupont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924) (stating "an action on behalf of the United States in its governmental capacity . . . is subject to no time limitations, in the absence of congressional enactment clearly imposing it")).  This means that if, at some point in the future, the United States does dispute that Plaintiffs hold vested title in a claimed R.S. 2477 road, the United States remains free to file suit against Plaintiffs to quiet title.  This is so even if the United States has treated Plaintiffs as holders of an R.S. 2477 right-of-way during a period where it made no administrative determination for its own purposes.

Until title is perfected under the Quiet Title Act, the United States retains the right to challenge a claim to vested title, but such challenge must be done through the QTA and not through an informal policy of the United States.  It also must be done as a good faith dispute, rather than as a means to circumvent R.S. 2477 rights.  *See Kane Cnty., Utah v. Salazar*, 562 F.3d 1077, 1090 (10th Cir. 2009) (Henry, J., concurring) (stating "[t]he federal agency is not entitled, under the FLPMA and the Administrative Procedures Act (APA), to close existing county roads asserted to be R.S. 2477 rights-of-way without a reasoned and nonarbitrary basis for doing so, such as . . . substantial evidence that the asserted right-of-way is invalid").

The longer the United States waits to make such a claim, the more questionable any dispute as to title becomes.  As stated by the United States Supreme Court and recognized by the Tenth

Circuit, "'government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice.'" *Sierra Club v. Hodel*, 848 F.2d 1068, 1080 (10th Cir. 1988) (alteration omitted) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915)). In light of the "special need for certainty and predictability where land titles are concerned," the United States' inaction in disputing title is an important factor for consideration. It has been forty-eight years since Congress passed FLPMA. It has been twenty-four years since the BLM implemented its own travel management plans and left the Jurisdictional Roads open to motor vehicle travel. Significant time has passed already.

## III.    BREADTH OF R.S. 2477 PROPERTY RIGHTS

The above states who a holder is of an R.S. 2477 right-of-way and how that status arises and continues. The court now turns to the bundle of rights held by an R.S. 2477 holder. The property rights bundled under R.S. 2477 rights-of-way are considerable, but the rights are balanced between the interests of the State and counties and those of the United States. The Tenth Circuit delineated the balance in the *SUWA Decision*, and it drew a line to "protect[] existing uses without interfering unduly with federal land management and protection." *SUWA Decision*, 425 F.3d at 749.

### A.    Management and Maintenance Authority

"As long as the Counties act within the existing scope of their rights of way," much of their regular activities may be done without oversight by the United States. *SUWA Decision*, 425 F.3d at 749. An R.S. 2477 holder has a right to manage the roads because "the right to exercise

34

management authority" follows the "creation and vestment" of an R.S. 2477 right-of-way. *Original TWS Case*, 581 F.3d at 1236 (McConnell, J., dissenting) (observing "[w]hat would being 'vested' and 'effective' mean, if the holder cannot manage or use the right without first going to court?").  The holder may maintain the roads, without consulting the United States, as long as the maintenance remains within the scope (i.e., length and width) of the right-of-way.  *SUWA Decision*, 425 F.3d at 748–49.  "Maintenance" preserves the status quo of "the existing road."  *Id.* at 749 (quotations and citation omitted).  It includes "the physical upkeep or repair of wear or damage whether from natural or other causes, maintaining the shape of the road, grading [or blading] it, making sure that the shape of the road permits drainage, and keeping drainage features open and operable."  *Id.* (quotations, citation, and alteration omitted).  The holder also has authority to regulate the roads;[18] post speed limit signs, stop signs, and road numbering and name signs as part of its transportation system;[19] engage in rescue operations and otherwise exercise its police powers;[20] and so forth.

---

[18]  Regulating the roads does not extend to changing the status of a road, such that a closed road may be opened or that restrictions may be lifted unilaterally when placed by another.  If rights have been infringed, an R.S. 2477 holder may pursue its remedy in court.

[19]  *Original TWS Case*, 581 F.3d at 1234–35 (McConnell, J., dissenting) (stating "Congress does not cavalierly pre-empt state law," and "some state or local law that has not been preempted" may allow for "posting or taking down signs") (alteration omitted); *see also* Utah Code Ann. § 17-50-305 (2019) (giving counties authority to "manage county roads"); *Id.* § 17-50-309 (giving counties authority "to enact ordinances and make regulations not in conflict with law for the control . . . and use of all public roads and highways in the county").  Through those statutes, the Utah Legislature granted broad powers to counties to manage, control, and enable use of county roads.  It is a non sequitur to say such authority does not include a corresponding ability to name and number the county roads for the benefit of the public and in aid of the counties' police powers.

[20]  *Sierra Club v. Hodel*, 737 F. Supp. 629, 635 (D. Utah 1990) (seeking a road improvement, in part, "to improve travel conditions in bad weather," and to resolve more efficiently "law enforcement and rescue situations in isolated areas").

### B.      Improvement of an R.S. 2477 Right-of-Way

In contrast, if the counties propose to change or improve an existing R.S. 2477 road, then they are required to consult with the United States so the United States may have the opportunity "to study potential effects" and "formulate alternatives" if appropriate.  *Id.* at 748–49.  The duty to consult is mutual in that the United States cannot avoid consulting about the proposed improvement.  The Tenth Circuit also has warned that the United States "may not use its authority, either by delay or by unreasonable disapproval, to impair the rights of the holder of the R.S. 2477 right of way."  *Id.* at 748.  This means when consulting, the United States "cannot prevent improvements to [an] R.S. 2477 right-of-way" if "the improvements are 'reasonable and necessary to ensure safe travel.'"  *Sierra Club v. Lujan*, 949 F.2d 362, 369 (10th Cir. 1991) (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1084, 1090 (10th Cir. 1988)).

### i.      Relationship Between R.S. 2477 Rights and FLPMA

NEPA and FLPMA are relevant when addressing an improvement, but they are circumscribed due to the bundle of rights held by an R.S. 2477 holder.  The "interplay between FLPMA and preexisting R.S. 2477 grants," has been addressed by the Tenth Circuit.  *Sierra Club v. Hodel*, 848 F.2d 1068, 1078 (10th Cir. 1988).  Section 603 of FLPMA requires the Secretary to manage wilderness study areas "'in a manner so as not to impair the suitability of such areas for preservation as wilderness.'"  *Id.* at 1085 (quoting FLPMA § 603(c), which is codified at 43 U.S.C. § 1782(c)).  A second duty is "'to prevent unnecessary or undue degradation of the WSAs and their resources.'"  *Id.* (alteration omitted) (quoting FLPMA § 603(c)).  Yet, an R.S. 2477 holder's rights also are protected under FLPMA, and a holder's bundle of rights "*include the right to develop*" when an improvement is reasonable and necessary.  *Id.* at 1086 & n.16 (emphasis in

original) (quotations and citation omitted).  This is so even if "the reasonable exercise of valid existing rights" causes "impairment of WSAs."  *Id.* at 1086 n.16 (citation omitted).

Reconciling the two, the Tenth Circuit has held "that valid existing rights are exempt from the nonimpairment standard" of § 603(c).  *Id.* at 1087.  "The exemption from the nonimpairment standard ensures that the federal government's new uses of its servient estate—the creation of WSAs—do not eviscerate the County's dominant estate."  *Id.*  This recognition of rights was not contingent upon the rights being judicially adjudicated.

As for the Secretary's second duty, the BLM lacks the ability "to deny the improvement altogether," even if the improvement will cause unnecessary or undue degradation of a WSA.  *Id.* at 1088, 1091.  Instead, the BLM must "determine whether there are less degrading alternatives" and if so, "to impose an alternative it deems less degrading."  *Id.* at 1090–91.

The above pertains to management of WSAs.  Section 302 of FLPMA pertains more generally.  It provides that, "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  Of course, that broad instruction must be read in light of the congressional ban that later was imposed on the DOI and on the protection that Congress afforded R.S. 2477 rights when it enacted FLPMA.  The exact interplay does not need to be addressed in this decision because it is enough to note that, while the United States has a role, it simply does not have the same authority and control over R.S. 2477 roads as it does with other land management activities. The State and counties' property rights are strongly in play based on congressional history.

ii.   Relationship Between R.S. 2477 Rights and NEPA

"'Congress in enacting NEPA . . . did not require agencies to elevate environmental concerns over other appropriate considerations.'"   *Sierra Club*, 848 F.2d at 1088 (quoting *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council, Inc.*, 462 U.S. 87, 97–98 (1983)). "NEPA seeks only to assure that environmental factors are considered in a meaningful manner before an agency commits to a major action."   *Id.*   A "major federal action encompasses not only actions by the federal government but also actions by nonfederal actors with effects that may be major and which are potentially subject to Federal control and responsibility."   *Id.* at 1089 (quotations, citation, and alteration omitted).   "The distinguishing feature of 'federal' involvement is the ability to influence or control the outcome in material respects."   *Id.* (quotations, citation, and alteration omitted).

How these principles were applied to a project in Garfield County is informative.   The project involved changing a road called "the Burr Trail from an essentially one-lane dirt road into an improved two-lane gravel road" to help ensure safety over "the western twenty-eight miles of the road." *Id.* at 1073, 1084; *Sierra Club v. Lujan*, 949 F.2d 362, 364 (10th Cir. 1991).   The project was extensive by any definition.   Yet, the Tenth Circuit held "that the NEPA requirements are triggered only by the duty imposed on BLM to prevent undue and unnecessary degradation of the WSAs."   *Sierra Club*, 848 F.2d at 1096.

The district court had imposed an injunction on construction pending appeal.   The Tenth Circuit "direct[ed] the district court to dissolve the injunction with respect to those parts of the project which neither border a WSA nor will unnecessarily or unduly degrade a WSA."   *Id.*   The Tenth Circuit reiterated its ruling three years later that the "BLM's NEPA responsibilities were

limited" as to the Burr Trail, and the "BLM's duty under FLPMA § 603 further limits its authority under NEPA to reviewing the County's road improvement projects *which affect WSAs*."[21] *Sierra Club*, 949 F.2d at 369 (emphasis in original). Thus, when an R.S. 2477 improvement is at issue, the analysis under FLPMA and NEPA is different.

### C.    R.S. 2477 Rights Are Based on Statute

The rights held by an R.S. 2477 holder are based on statute. Consequently, if the United States denies or impairs an R.S. 2477 right, it does so in violation of statute. "Federal law governs [the Tenth Circuit's] interpretation of R.S. 2477." *San Juan County, Utah v. United States*, 754 F.3d 787, 798 (10th Cir. 2014). The R.S. 2477 statute "was enacted against a backdrop of common law," which "has provided convenient and appropriate principles for carrying out congressional intent." *Id.* (quotations, citations, and alteration omitted). Nevertheless, if common law "contravenes congressional intent," as to R.S. 2477 roads, then application of common law principles ceases. *Id.* (quotations and citation omitted). Any borrowing of common law principles does not transform R.S. 2477 rights into mere common law. They simply inform what the scope of rights are under the statutory grant of an R.S. 2477 right-of-way.

The court is aware of a ruling from this district to the contrary. The reasoning applied in that decision is not persuasive to this court because it is contrary to the statutory rights held by an R.S. 2477 holder. In *SUWA v. BLM*, 551 F. Supp. 3d 1226, 1231, 1233 (D. Utah 2021) (the "*Bull Valley Gorge* court"), that court concluded when the *SUWA Decision* speaks about maintenance

---

[21]  The Tenth Circuit did not address the "duty under FLPMA § 302(b)," *Sierra Club*, 949 F.2d at 368, but since Section 302(b) addresses lands generally versus the sensitive WSA lands, it would be illogical to impose greater restrictions on R.S. 2477 improvements under Section 302 than what the Tenth Circuit imposed under Section 603 of FLPMA.

and improvements, it merely was common law speech. According to the *Bull Valley Gorge* court, FLPMA and NEPA trump the constructs in the *SUWA Decision*, and FLPMA and NEPA constructs must be applied in place of the maintenance and improvement requirements. *Id.* at 1236, 1240–42. Indeed, the *Bull Valley Gorge* court went so far as to hold that if the United States ends a consultation with a county over an improvement, there is no recourse under the APA because consultation rights are merely common law. *Id.* at 1241–42. This court respectfully disagrees.

The *SUWA Decision* did rely upon principles arising under common law property rights, but those principles were to determine what rights adhered to the R.S. 2477 grant—a grant made by Congress under a statute. The *SUWA Decision* defined the scope of the statutory grant. When there is infringement of those rights, a holder is not merely asserting a violation of the common law. It is asserting a violation of the statutorily granted rights. Congress later affirmed, via the FLPMA statute, that all rights vested under R.S. 2477 remained intact despite the repeal of R.S. 2477 in 1976. Accordingly, when one infringes upon an R.S. 2477 holder's rights, they do so in violation of the original R.S. 2477 statutory grant and under Section 701(a) of FLPMA, or in other words, they do so in violation of statute. Moreover, as discussed above, it is R.S. 2477 rights that circumscribe NEPA and FLPMA so R.S. 2477 rights can operate as granted. R.S. 2477 rights, including consultation rights, are protectable as statutory rights. That is part of the bundle of rights held by an R.S. 2477 holder to ensure in can properly manage the roads and ensure public safety.

## IV.    ACCRUAL STANDARDS

As stated above, the United States' motions to dismiss assert there is no disputed title concerning the Jurisdictional Roads. Who an R.S. 2477 holder is and what rights an R.S. 2477

holder has are important to that analysis.  Whether a title dispute has arisen due to those rights, however, also depends on what constitutes a disputed title under the QTA.  Tenth Circuit caselaw addressing the QTA presents a complication because it appears to set one standard for when the statute of limitations is triggered and a different standard for when disputed title occurs to create a cause of action.  Were one to read Tenth Circuit caselaw this way, "the QTA's statute of limitations would run before it was even possible to bring suit under the QTA."  U.S. Amended Mot. to Dismiss, at 25 n. 7 (ECF No. 671) (quotations and citation omitted).  The court now addresses relevant caselaw.

### A.   Relationship Between a Statute of Limitations and a Cause of Action

"Traditionally, a right 'accrues'—starts the clock ticking on the limitations period—'when the plaintiff has a complete and present cause of action.'"  *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1275 (10th Cir. 2014) (quoting *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013)).  As recently as last month, the United States Supreme Court has stated again that "accrue" has "a well-settled meaning: A right accrues when it comes into existence." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsry. Sys.*, 144 S. Ct. 2440, 2451 (2024) (quotations and citations omitted).  The stated "definition has appeared 'in dictionaries from the 19[th] century up until today.'"  *Id.* (quoting *Gabelli*, 568 U.S. at 448).  "Legal dictionaries in the 1940s and 1950s uniformly explained that a cause of action "'accrues' when a suit may be maintained thereon.'" *Id.* (quoting Black's Law Dictionary 37 (4th ed. 1951)) (other citation omitted).

This means an action "does not become 'complete and present' for limitations purposes— it does not accrue—until that plaintiff can file suit and obtain relief." *Id.* (quotations, citation, and emphasis omitted).  The statute of limitations is intertwined with the harm because the "statute of

limitations does not begin to run until [one] is injured." *Id.* at 2450. According to the Supreme Court, it has "repeatedly recognized that Congress legislates against the 'standard rule that the limitations period commences when the plaintiff has a complete and present cause of action." *Id.* at 2451 (quotations and citation omitted). Thus, the Supreme Court has "rejected the possibility that a limitations period commences at a time when the plaintiff could not yet file suit as inconsistent with basic limitations principles." *Id.* (quotations, citation, and alterations omitted). The rule applies "[u]nless Congress has told us otherwise in the legislation at issue." *Id.* (quotations and citation omitted).

Courts have held that when Congress opened the door to quiet title suits against the United States, it did set forth a different rule, but only as to older claims. Not until 1972, "when the Quiet Title Act was enacted," could one sue the United States to quiet title. *Stubbs v. United States*, 620 F.2d 775, 780 (10th Cir. 1980). Since waiver of sovereign immunity was at issue, the Tenth Circuit found it unsound to conclude that "no matter how old" a claim was, it "would not be barred until 12 years after enactment of the 1972 law." *Id.* In rejecting that interpretation, the Court relied on the legislative history that showed "Congress was reluctant . . . to open up stale claims to litigation." *Id.* (citing H.R. Rep. No. 92-1559 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 4597 et seq.).

The Senate originally had planned to allow older claims to be brought, but upon receiving objections from the Department of Justice, the QTA's proposed language was modified so only claims accruing in 1960 or later could be brought. *See id.* at 780–81. Other than that restriction on stale claims, Congress did not modify in any way the standard rule that applies to statutes of limitation. Thus, unless a claim arose more than twelve years prior to passage of the QTA, the

QTA's statute of limitations cannot commence until one is injured and has a right to bring a cause of action.

To the extent Tenth Circuit caselaw were to allow the QTA's statute of limitations to run before it is possible to bring suit under the QTA, that would be contrary to the basic principles stated in *Corner Post, Inc.*  A challenge exists to reconcile the QTA's statutory requirements, accrual principles, and Tenth Circuit caselaw so a cause of action and commencement of the QTA's statute of limitations result from the same triggering event.  The QTA also sets forth two different standards for how the limitations period commences.  One standard applies to all entities except states, which the court will address first, and the other applies to states.

**B.**     **Standard Applicable to Non-States Under the QTA**

i.     QTA's Statutory Language

"Any civil action under [the QTA], except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued."  28 U.S.C. § 2409a(g).  An action "accrue[s] on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  *Id.*  According to the Tenth Circuit, the trigger is "an exceedingly light one," and the clock starts when one knew or "*objectively* should have known about the government's claim." *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012) (emphasis in original) (citations omitted).

The government's claim must be an adverse claim.  *San Juan Cnty., Utah v. United States*, 754 F.3d 787, 795–96 (10th Cir. 2014).  The line between when an event does not trigger the statute of limitations compared to when it does is the nature of the notice.  The notice, even when in a Federal Register, is insufficient unless it shows the property claim "conflicts with the

plaintiff's interest," such that the two property interests cannot "peaceably co-exist." *Kane County (1)*, 772 F.3d at 1217 (quotations and citation omitted).

    ii.    <u>Application of Statutory Language by *Knapp*</u>

The Tenth Circuit applied the "knew or should have known" standard in *Knapp v. United States*, 636 F.2d 279 (10th Cir. 1980). The case involved a 48-acre parcel in Wyoming where an error had occurred in the conveyance document. *Id.* at 280–81. When determining if the statute of limitations barred the suit, the Tenth Circuit noted that Section 2409a applies when "the United States claims an interest" in the property. *Id.* at 282 (quotations and citations omitted). Whether a claim is legitimate is "irrelevant" as long as the claim "constitutes a cloud on the plaintiffs' title." *Id.* The Court further stated that the "knew or should have known" standard does not require "[k]nowledge of the claim's full contours." *Id.* at 283. "All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Id.* (citation omitted). Thus, a cloud on title and the United States claiming some adverse interest was enough to trigger the statute of limitations, according to the Tenth Circuit, in 1980. Because the statute of limitations cannot commence before accrual of a cause of action, the cloud on title standard under *Knapp* necessarily had to be sufficient to give rise to a cause of action under the QTA.

    iii.    <u>Application of Statutory Language by *Rio Grande*</u>

In 2010, the Tenth Circuit again applied the "cloud on title" standard in the case of *Rio Grande Silvery Minnow (Hybognathus Amarus) v. Bureau of Reclamation*, 599 F.3d 1165 (10th Cir. 2010) (hereinafter "*Rio Grande*"). The case involved a large water project, including dams, canals, acequias, laterals, drains, and levees. *Id.* at 1169. The project required the grant of easements and rights-of-way, and as the project progressed, questions arose whether the United

States held fee title to any of the property or merely easements. *Id.* at 1170–72. Some years after the questions arose, the plaintiff sought to quiet title against the United States to certain dams, water rights, and tracts of property. *Id.* at 1174.

The trial court and Tenth Circuit concluded the plaintiff's claims were time barred. Because the standard was knew or should have known, the Tenth Circuit concluded "explicit notice" of the United States' claim was not required. *Id.* at 1176 (quotations and citation omitted). Quoting from *Knapp*, the Tenth Circuit stated, "'[a]ll that is necessary is a reasonable awareness that the Government claims *some* interest adverse to the plaintiff's.'" *Id.* at 1176, 1179 (emphasis added by *Rio Grande* court) (quoting *Knapp*, 636 F.2d at 283). "[T]he precise nature of the property interest upon which the United States predicates its claim of title" does not need to be known. *Id.* at 1176, 1182 (citation omitted). Nor does the United States need to "assert a full legal title in the disputed property for a limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create *a cloud on title*." *Id.* at 1176 (emphasis added) (citations omitted).

After making these pronouncements, the Court then cited three other cases for the notion that a cloud on title is enough for a claim to accrue. *Id.* (citing *Kinscherff v. United States*, 586 F.2d 159, 160 (10th Cir. 1978) ("stating that, under New Mexico law," attempting "'to remove a cloud from title presupposes that the plaintiff has some title to defend'"); *Spirit Lake Tribe v. N. Dakota*, 262 F.3d 732, 738 (8th Cir. 2001) ("noting that the government's interest simply must be a 'cloud on title,' that is, 'a reasonable claim with a substantial basis'"); *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1198 (9th Cir. 2008) (stating accrual occurs "'as soon as the United States makes a claim that creates even a cloud on a plaintiff's ownership interest'")).

45

"Thus, simply put, the limitations period is triggered when a landowner has reason to know that the government claims some type of adverse interest in that land." *Id.* at 1177 (quotations, citation, and alteration omitted).

<div align="center">

iv.   Application of Statutory Language by *George*

</div>

In 2012, the Tenth Circuit stated again that "the trigger for starting that twelve-year clock running is an exceedingly light one," because it starts to run as soon as a plaintiff knew or objectively should have known about a claim by the United States. *George*, 672 F.3d at 944. If the United States "publishes a property claim in the Federal Register," and one is "subject to or affected by it," the Tenth Circuit said that is enough to provide notice and trigger commencement of the statute of limitations. *Id.* at 944–45. According to the Tenth Circuit, "[t]o be 'subject to or affected by' a regulation," means "one must be prone, disposed, exposed, liable, or influenced by it." *Id.* at 945 (citation omitted). Quoting from the Oxford English Dictionary for the definition of "subject," the Tenth Circuit said it means, "exposed or open to; prone to or liable to suffer from something damaging, deleterious, or disadvantageous." *Id.* Because a cause of action only arises when there is an injury, making one exposed, open, or prone to injury necessarily must be read in that context. The United States' claimed interest must actually be adverse to a plaintiff's claimed property rights rather than merely being a possibility.

This point finds support in the text of *George* itself when it analyzed two cases from the Ninth Circuit. In one case, the United States attempted to argue that merely asserting a "claim of title to the land was enough to start the limitations clock running" over a dispute about an easement. *George*, 672 F.3d at 947 (citing *Michel v. United States*, 65 F.3d 130, 131 (9th Cir. 1995)). Both the Ninth Circuit and Tenth Circuit rejected the notion because "a government's claim of title to

<div align="center">

46

</div>

land isn't always and inherently inconsistent with private ownership of an easement over that land. Easements and servient estates can (and usually do) peaceably coexist." *Id.* Thus, according to *George* and *Michel*, a triggering event under the QTA only occurs when there is "some assertion of an adverse interest." *Id.* (citing *Michel*, 65 F.3d at 132). Such an assertion gives rise to a cause of action because, again, if an event is enough to trigger the QTA's statute of limitations, it must involve an actionable injury.

The rulings above appear to set forth a consistent interpretation of the Quiet Title Act as applied to entities other than states. No en banc panel of the Tenth Circuit has reversed the holdings in *Knapp*, *Rio Grande*, or *George*. Nor has the United States Supreme Court.

   v. <u>Claim of Exclusive Control Is Merely One Species of a Title Dispute</u>

In 2014, two years after *George*, the Tenth Circuit addressed two cases involving R.S. 2477 road claims. The areas of dispute about the QTA's triggering events for commencement of the statute of limitations and disputed title arise from those two cases. The first case is *San Juan County, Utah v. United States*, 754 F.3d 787 (10th Cir. 2014) wherein the concepts of "exclusive control," "exclusive claim," or "exclusive ownership" arose. The United States had closed two segments of a road in Canyonlands National Park adjacent to a road called the Salt Creek Road. *Id.* at 793–94. San Juan County sought to quiet title to the Salt Creek Road. The United States took issue with San Juan attempting to quiet title to the road on the ground that the Salt Creek Road was merely a segment of the same road that had two other closures, and that by closing those two other segments, the United States had gained exclusive control of the entire road. *Id.* at 794–95. According to the United States, the closures "put Plaintiffs on notice" that the United States

"had the exclusive right to deny public access over the [Salt Creek] road."  Answering Brief of

Defendants-Appellees, Appellate Case No. 11-4146, at 36 (10th Cir. Mar. 5, 2012).[22]

The United States' appellate brief focused on exclusiveness.  According to the United

States, "Plaintiffs knew or should have known the government *claimed* the exclusive right to deny

their access to the portions of the route that Plaintiffs ultimately claimed."  *Id.* at 38 (emphasis in

original) (quotations and citation omitted).  It also asserted, "[t]he Park Service's comprehensive

assertion of exclusive jurisdiction and control over Salt Creek Canyon and Salt Creek route since

1964 has been both publically [sic] communicated and open and notorious."  *Id.* at 40.

In that context, the Tenth Circuit addressed whether the QTA's statute of limitations had

run because the road closures were more than twelve years prior to when suit was filed.  San Juan

argued the two closures "did not give notice of an exclusive claim because the United States

continued to allow the public to use Salt Creek Road."  *San Juan County, Utah*, 754 F.3d at 794.

In turn, the Tenth Circuit applied the same analysis as a Ninth Circuit case that addressed whether

the United States' actions had "put the claimant on notice of the United States' claim to *exclusive*

ownership or exclusive control over the road."  *Id.* (emphasis in original) (citing *McFarland v.*

*Norton*, 425 F.3d 724, 727 (9th Cir. 2005)).  The management activities had to be "inconsistent

with the claimed right-of-way."  *Id.*  The Tenth Circuit concluded, because the public still was able

to use the portion of the Salt Creek Road claimed by San Juan, the two prior closures did not put

the county on "notice of the United States' claim of a right to exclude the public, as would be

necessary to assert a claim of exclusive ownership to Salt Creek Road."  *Id.* (citing *George*, 672

---

[22]  When citing to the United States' appellate brief in the Salt Creek Road case, pincites are to the
pagination at the bottom of the page.

F.3d at 947).  The United States' claimed adverse interest was exclusive ownership and exclusive control.  The Tenth Circuit addressed notice within that context.

A few months after the *San Juan* ruling, the Tenth Circuit issued *Kane County (1)*.  In that decision, the Court noted it had "recently explained in [*San Juan*] that in order to trigger the QTA limitations period against a party claiming an R.S. 2477 right-of-way, the United States must claim 'exclusive control' of a road." *Kane County (1)*, 772 F.3d at 1215 (citations omitted).  Because "a public right-of-way can generally 'peaceably coexist' with an underlying ownership interest," the Court stated, "the United States must provide a county or state with sufficient notice of the United States' claim of a right to exclude the public." *Id.* at 1216 (quotations and citation omitted).

Based on these two rulings, the question becomes, when a case involves an R.S. 2477 right-of-way, does a title dispute and commencement of the statute of limitations only occur when the United States asserts a claim of exclusive control over the road?  Nothing in the statutory language distinguishes an R.S. 2477 claim from other property claims.  Thus, only if the Tenth Circuit has concluded that notice of an adverse claim cannot be sufficient under any other circumstances does one reach that result when dealing with an R.S. 2477 road.

Yet, within the *Kane County (1)* case itself, it shows that claims of exclusive ownership or control are merely one species of a title dispute.  The United States can dispute title in other ways. Both the *San Juan* and *Kane County (1)* court "left room for the possibility that 'management activities that were inconsistent with the claimed right-of-way' could provide the necessary notice to start the limitations period." *Kane County (1)*, 772 F.3d at 1218 n.2 (alteration omitted) (quoting *San Juan Cnty.*, 754 F.3d at 794)).  Hence, the Court's rulings about exclusive ownership or

exclusive control must be read in the context of what type of claim the United States is making against one's property interest rather than as a blanket rule applicable to all R.S. 2477 rights.

In this case, the United States asserts it is flawed to contend "that the United States must assert 'exclusive control' over an area in order to trigger the QTA's statute of limitations that applies to states."[23]  U.S. Reply in Supp. Mot. to Dismiss, at 9 (ECF No. 704).  Instead, according to the United States, "[t]he court in *San Juan* uses the term 'exclusive' to describe the United States' claim to the road at issue in that case only because that is how the United States described its claim."  *Id.* at 15–16.  This court concurs.  Reading *San Juan* and *Kane County (1)* in that light allows one to reconcile those two cases with the holdings in *Knapp*, *Rio Grande*, and *George*.

Notice is fact specific.  R.S. 2477 roads are a non-possessory interest in the land over which they travel.  Because dominant and servient estates typically peaceably co-exist, notice needs to be more robust for a county to be alerted to an adverse claim against an R.S. 2477 right-of-way.  Nevertheless, the court concludes a QTA title dispute is not limited only to those situations where the United States asserts exclusive control or full title rights to the right-of-way.

vi.    Tenth Circuit Conflict Over Cloud on Title Standard

As discussed above, in multiple cases prior to 2014, the Tenth Circuit has stated the QTA's statute of limitations is triggered by a cloud on title.  The cases did not focus on what is a disputed title under the QTA.  In 2014, in *Kane County (1)*, the Tenth Circuit addressed what constitutes "disputed title" under the QTA and stated it was a matter of first impression.  *Kane County (1)*, 772 F.3d at 1211.  Looking at the issue as a matter of first impression, the Court rejected the "cloud

---

[23]  The United States made its assertions when addressing the State's argument about the QTA's statute of limitations, but whether "exclusive control" is required is equally applicable to claims brought by the Counties.

on title" standard "as incompatible with the rule that conditions on a waiver of sovereign immunity are to be specifically observed." *Id.* at 1212. Thus, according to the Tenth Circuit, one cannot bring a QTA claim when there is a mere cloud on title.

The *Kane County (1)* court left untouched, however, the Tenth Circuit's prior rulings that the QTA's statute of limitations is triggered by a cloud on title. Accordingly, the Tenth Circuit potentially has created a situation where the QTA's statute of limitations can be triggered and run, due to a cloud on title, before one has an opportunity to bring a cause of action. Ultimately, this is an issue for the Tenth Circuit to address and clarify.

For now, though, this court must determine how to apply Tenth Circuit caselaw to this case. One guide is that "'[a]bsent an intervening Supreme Court or en banc decision justifying such action,'" a panel "'lack[s] the power to overrule [the Court's] own precedent.'" *United States v. Sturm*, No. 09-1386, 426 F. App'x 582, 597 (10th Cir. Apr. 4, 2011) (quoting *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1130 (10th Cir. 2009)). A second guide is the *Corner Post, Inc.* decision issued by United States Supreme Court last month whereby it held there cannot be one standard for triggering the statute of limitations and another standard for accrual of a cause of action absent express congressional intent. *Corner Post, Inc.*, 144 S. Ct. at 2450. That intent, as discussed above, is absent in the QTA. It also is contrary to congressional intent as to why it instituted the QTA. Why waive sovereign immunity to allow suit only if the suit is to be barred by a statute of limitations before the suit may be brought?

Under Tenth Circuit caselaw prior to 2014, a "cloud on title" was not an unbounded phrase. It involved "'a reasonable claim with a substantial basis.'" *Rio Grande*, 599 F.3d at 1176 (quoting *Spirit Lake Tribe v. N. Dakota*, 262 F.3d 732, 738 (8th Cir. 2001) ("noting that the government's

interest simply must be a 'cloud on title,' that is, 'a reasonable claim with a substantial basis'"")). The contours of a claim had and have to be sufficient to provide reasonable notice; otherwise, one's property rights may be impacted before one ever becomes aware there was an adverse claim. Even the "exceedingly light trigger" phrase has limits because it is based on what one knew or objectively should have known. One cannot objectively know about an adverse claim unless the claim has sufficient depth and substance to be recognized versus being an obscure act that leaves one guessing about whether it is adverse.

Yet, in *Kane County (1)*, the court expressed concern that the "cloud on title" standard was too ambiguous. According to the *Kane County (1)* court, "to satisfy the 'disputed title' element of the QTA, a plaintiff must show that the United States has either expressly disputed title or taken action that implicitly disputes it." *Kane County (1)*, 772 F.3d at 1212. Under the *Kane County (1)* "standard, a plaintiff need not show the United States took direct action to close or deny access to a road—indirect action or assertions that actually conflict with a plaintiff's title will suffice." *Id.*

Putting the *Kane County (1)* standard side by side phrases such as "a reasonable claim with a substantial basis," or "a reasonable awareness that the Government claims some interest adverse to the plaintiff's," it is difficult to discern how the *Kane County (1)* standard is different from how the Tenth Circuit previously defined a "cloud on title." That is, unless the *Kane County (1)* court was meaning a QTA title dispute may only arise when the United States is claiming full title and exclusive control. If so, that would be contrary to *Rio Grande*, wherein the Tenth Circuit previously held that assertion of "full legal title" was not required. *Rio Grande*, 599 F.3d at 1176, 1182. For purposes of this decision, the court looks to whether there have been direct actions or indirect actions or assertions that are adverse to Plaintiffs such that a title dispute exists. It uses

this standard to show that whether a cloud on title standard is applied in this case or the *Kane County (1)* standard, there is disputed title.

### C.    Standard Applicable to States Under the QTA

The above analysis applies to counties and entities other than states.  The court now addresses the accrual standard that applies to states.  When a State seeks to quiet title to land, the State also must commence the action within twelve-years, but a State's triggering event is not based on the knew or should have known standard.  28 U.S.C. § 2409a(i), (k).  "Notice for purposes of the accrual of an action brought by a State" must be:

> (1) by public communication with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or
>
> (2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

*Id.* § 2409a(k).  Like Section 2409a(g), for notice to be sufficient, it must be "notice of an *adverse* claim" against the State.  *San Juan Cnty., Utah v. United States*, 754 F.3d 787, 796 (10th Cir. 2014) (emphasis in original) (citation omitted).  Such notice "requires more than fair notice; it requires substantial activity by the United States."  *Id.* at 795.  In other words, the activity may be "made [by] substantial improvements or substantial investments."  28 U.S.C. § 2409a(i).  Substantial activities may occur "pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities." *Id.*  Congress provided those examples and further stated that activities similar to those enumerated also may constitute substantial activities.

## V.      THE UNITED STATES' ACTIONS HAVE GIVEN RISE TO A DISPUTED TITLE

Having addressed the law about R.S. 2477 holders, the bundle of property rights a holder has, and how a QTA claim accrues for states and counties, the court now addresses whether the United States' position and actions towards Plaintiffs' asserted title have been sufficient to create a title dispute as to the eight Jurisdictional Roads.  For the reasons stated below, the court concludes they have.

Although the United States has developed a course of action to make it appear like there is no disputed title, its actions show differently.  "To say that the [State and Bellwether Counties'] claims are preempted until they are proven is to presume, without proof, that none are valid.  That defeats the point of vested property rights." *Original TWS Case*, 581 F.3d at 1239 (McConnell, J. dissenting).  While this case does not involve preemption in the context used in the *Original TWS Case*, the point is still relevant that treating Plaintiffs as non-title holders presumes their claims are invalid and eviscerates their vested and existing property rights.  The court addresses some examples of how the United States' position has been carried out in practice.

### A.      Monument Management Plan

"On September 18, 1996, President Clinton created the Grand Staircase-Escalante National Monument (Monument), located in Kane and Garfield Counties, Utah, to protect a 'spectacular array of scientific and historic resources.'" *Kane Cnty., Utah v. Salazar*, 562 F.3d 1077, 1079 (10th Cir. 2009) (hereinafter the "*Monument Plan Decision*") (quoting 61 Fed. Reg. 50,223 (Sept. 18, 1996)).  The proclamation gave the BLM management authority for the Monument and directed the Secretary to prepare a management plan.  *Id.*  The Secretary signed the plan on November 15, 1999, and it became effective on February 29, 2000 (the "Monument Plan").  65

Fed. Reg. 10819, 10819 (Feb. 29, 2000).  The Monument Plan set forth "a transportation system" for the 1,870,800 acres included in the Monument.  *Id.*  That transportation system determined which roads would be open and which would be closed across that vast acreage.

The BLM determined the criteria for a road to be open or closed.  *Monument Plan Decision*, 562 F.3d at 1080.  Its "basic philosophy in determining which routes will be open was to determine which routes access some destination (e.g., scenic overlook, popular camping site, heavily used thoroughfare) and present no significant threat to Monument resources."  *Id.* (quotations and citation omitted).  On the other hand, "[r]outes that were not considered necessary or desirable (for resource protection purposes) will not be kept open for motorized and mechanized public access."  *Id.* (quotations and citation omitted).

The BLM also established a plan to restore routes to their natural state.  Its focus was "to restore routes in areas that are easily accessible to the public and that involve sensitive resources in immediate danger of being degraded."  *Id.* at 1081 (quotations and citation omitted).  Although roads in areas easily accessible to the public have a likely possibility of having been formed under R.S. 2477, the Monument Plan did not take that into consideration.  Instead, the plan specified when wash outs occurred, such routes were not to be repaired.  *Id.* (quotations and citation omitted).  Nor were any natural barriers like boulders or downed limbs to be removed.  *Id.* (quotations and citation omitted).  Indeed, the BLM could go so far as "ripping up the route bed and reseeding with vegetation natural to that area," *id.* (quotations and citation omitted), merely because the BLM determined the road should be closed under the criteria it established.

The Bellwether Counties filed suit contesting the United States' authority to do what it did.  The Bellwether Counties contested that the BLM could disregard vested and existing R.S. 2477

property rights, but the Tenth Circuit noted that the Bellwether Counties "did not identify, with specificity, any alleged R.S. 2477 rights-of-way." *Monument Plan Decision*, 562 F.3d at 1082, 1087 n.5. The Tenth Circuit also emphasized the following language from the Monument Plan:

> Nothing in this Plan alters in any way any legal rights the Counties of Garfield and Kane or the State of Utah has to assert and protect R.S. 2477 rights, and to challenge in Federal court or other appropriate venue, any BLM road closures that they believe are inconsistent with their rights.

*Id.* at 1080 (quotations, citation, and emphasis omitted). Based on that language, the Court found that the Bellwether Counties' rights had been protected. *Id.* at 1088. The Court did not address, however, the impact on a holder's vested rights, and that the BLM could not require adjudication for those rights to be protected.

By 2009, when the Tenth Circuit addressed the Monument Plan, thirty-three years had passed since FLPMA was enacted. The old notions about liberal federal land use were in the past, and it was normal for the BLM to manage federal lands. What was not normal, however, was for the BLM to manage an entire transportation system in the Bellwether Counties. Although the BLM is prohibited from issuing regulations managing R.S. 2477 roads, it nevertheless has determined the transportation system for the entire Monument without regard to any R.S. 2477 rights across almost 1.9 million acres. In doing so, the BLM did not stop to ask what roads had been managed by Kane and Garfield Counties prior to the plan's issuance, or what the impact was on those vested property rights. Its blanket statement about all R.S. 2477 rights being protected was and is nothing more than a fiction because the BLM did not protect the rights. It nullified them unless the State and Counties can prove up their rights in court.

The BLM altered the status of existing rights by moving all roads under its jurisdiction and authority and by controlling whether a road will be opened or closed based on criteria it set. This is contrary to the rights of an R.S. 2477 holder. Indeed, the BLM is not entitled "to make unilateral changes in the status quo without first considering the legitimate interest of the other." *Monument Plan Decision*, 562 F.3d at 1091 (Henry, J, concurring) (citation omitted).

As chance would have it, about four months after the *Monument Plan Decision*, the Court issued the *Original TWS Case* wherein a divided panel held that adjudication is required before the State or counties have the right to manage any road. *See Original TWS Case*, 581 F.3d 1198, 1205 (10th Cir. 2009). As discussed above, that decision did not withstand en banc review, where the en banc panel recognized the divided panel's conclusion was inconsistent with law. *See En Banc TWS Case*, 632 F.3d 1162, 1172–73 (10th Cir. 2011). To this day, however, the BLM has not relinquished control of the transportation system. This is so for the Monument and for the Kanab Field Office management plans. Between the two plans, all Jurisdictional Roads are under the BLM's transportation systems. The United States has been unable to regulate R.S. 2477 roads through formal rulemaking or informal binding determinations, but it is now regulating them under these management plans in such a way that valid, existing R.S. 2477 rights are no longer under the State and Bellwether Counties' control as holders of the R.S. 2477 rights-of-way.

B.      **Settlement Agreement Criteria**

A further shift occurred in 2017. "On January 13, 2017, the United States, through the BLM, entered into a Settlement Agreement" with SUWA and other "environmental groups." Plaintiffs' Supp. Compl., ¶ 8 (ECF No. 395). The Settlement Agreement is filed in the case of *Southern Utah Wilderness Alliance v. United States Department of Interior*, Case No. 2:12-cv-257

(D. Utah May 16, 2017).  Under the agreement, the BLM agreed to issue new travel management plans for various areas, including Kane County.  Settlement Agmt., ¶ 13 (ECF No. 540-1).  It also agreed to assess routes to determine their "purpose and need," and if a route has no purpose and need, it "will not be proposed as part of the dedicated route network."  *Id.* ¶¶ 16.c, 17.a.  For "each route report," the BLM further agreed that it "will include a brief narrative summary of how it has applied the designation criteria to the route for each alternative route designation."  *Id.* ¶ 17.d.  The "designation criteria" is to be done pursuant to FLPMA.  *Id.*

Although the Settlement Agreement states it is "subject to valid existing rights," it also states that the BLM retains discretion "to open, close, modify, or add new routes," to its travel management plans.  *Id.* ¶ 14.  Because the United States does not treat any road as being an R.S. 2477 right-of-way absent judicial adjudication, this is another action where the United States is setting forth parameters governing Kane County's transportation system.  The court concludes it constitutes an implicit dispute of Plaintiffs' title because such unilateral decision making is contrary to the rights of a holder.  The United States is exerting control over the status of roads unless a court determines Plaintiffs own the right-of-way and title is quieted in Plaintiffs' favor.

### C.    Title V Permits

Above, this court stated the United States has engaged in a three-part course of action to defeat Plaintiffs' R.S. 2477 rights for any road that is open.  The court now addresses Part Three of the course of action.  Because the United States treats Plaintiffs as non-holders for all roads that have not had title perfected under the QTA, it has taken the position that it has no duty to consult with Plaintiffs about proposed road improvements.  Instead, if Plaintiffs want to improve a road, according to the United States, Plaintiffs must seek a Title V permit.

i.    <u>Nature of a Title V Permit</u>

Title V permits are a product of FLPMA.  Although Congress repealed the R.S. 2477 grant, it did not entirely ban the creation of any new road.  Instead, it gave the BLM discretion to grant a permit to establish a new right-of-way.  43 U.S.C. § 1761(a)(6).  Rights under a Title V permit are significantly less than the bundle of property rights detailed above for an R.S. 2477 holder.  The United States itself recognized this in 1988 when it argued a county "should not be compelled unwillingly to accept the *markedly different rights* conferred by a FLPMA right-of-way permit in place of its current R.S. 2477 grant."  *Sierra Club v. Hodel*, 848 F.2d 1068, 1088 (10th Cir. 1988) (emphasis added) (quotations and citation omitted).

Unlike an R.S. 2477 holder's right to improve a road when the improvement is reasonable and necessary, a Title V permit is discretionary, and the BLM can "require common use of a right-of-way." 43 C.F.R. § 2802.10(a), (b).  The BLM may charge fees for the "application and grant," *id.* § 2804.14, and for monitoring, *id.* § 2804.15, but it retains the discretion to waive the fee for "a State or local government."  *Id.* § 2804.16.  The BLM can deny a permit for any use "inconsistent with the purpose for which BLM manages the public lands," *id.* § 2804.26; *see also* 43 U.S.C. § 1765 (stating "terms and conditions" that may apply to protect and manage the lands).  In contrast, under R.S. 2477, an improvement that is reasonable and necessary cannot be denied even if it will cause some degradation as long as it is not undue degradation.  Under Title V, each permit is "limited to a reasonable term," and must "specify whether it is or is not renewable."  43 U.S.C. § 1764(b).  If a permit is not renewed, then one "must remediate and restore the right-of-way area to a condition satisfactory to BLM." 43 C.F.R. § 2807.19(b).  An R.S. 2477 improvement

has no term limit or remediation requirements because the improvement becomes part of the R.S. 2477 grant.

    ii.  <u>Condition of Three Jurisdictional Roads</u>

   Concerns have been raised about the condition of three of the Jurisdictional Roads.  The K6000 House Rock Valley Road is one of them, the Hole-in-the-Rock Road, as it travels through Kane County and Garfield County are the other two, which are numbered K9000 and G9000.  In 2005, Kane County proposed to improve the Hole-in-the-Rock Road, as it travels through that County, "utilizing a grant of approximately $2 million."  Kane County Lttr., at 2 (ECF No. 734-2).  The United States acknowledged the need for the improvements, but because it does not recognize or treat Kane County as an R.S. 2477 holder, it would not and will not allow the improvement unless Kane County applies for a Title V permit.[24]

   To put this in context, in this suit, the United States seeks to dismiss Kane County's claim as to the Hole-in-the-Rock Road on the basis that there is no title dispute.  This is so because the United States neither admits nor denies Kane County's title.  Yet, it is denying Kane County has the right to improve the road as an R.S. 2477 holder because Kane County's title has not been judicially adjudicated.  Again, imposing a mandate of adjudicated title is contrary to law and the United States' authority.  By its actions, the United States is implicitly denying that Kane County is an R.S. 2477 holder because the United States cannot refuse to consult with an R.S. 2477 holder

---

[24]  The United States has informed the Bellwether Counties that if they apply for a Title V permit, it will not waive their  rights to pursue a Quiet Title Action.  Due to the course of action the United States has implemented to ensure the courthouse doors are shut to the Bellwether Counties, however, that reservation provides little consolation when one is trading R.S. 2477 rights for a Title V permit.

over road improvements.  Offering consultation under a Title V permit is not the same, and only further shows the United States is implicitly denying Kane County's status as an R.S. 2477 holder.

The United States has asserted similar positions as to the other two roads.  This is so even though in 1988, the BLM administratively "recognized and adopted the position that Garfield County possesses an R.S. 2477 right-of-way for the Hole-in-the-Rock road [G9000]." *In re Sierra Club*, 104 IBLA 17, 18 (Aug. 17, 1988) (citing BLM Lttr. (Jan. 20, 1988)).

Major roads receive the most traffic and are most likely to be in need of improvements. Under the United States' course of action, if it can keep the courthouse doors shut by denying there is a title dispute, but keep road improvements under R.S. 2477 stopped by not treating the Bellwether Counties as R.S. 2477 holders, then it can force its conditions on the Bellwether Counties under Title V when the Bellwether Counties seek to address critical safety conditions. By that course of action, the roads would then be further controlled by the BLM under Title V conditions to the evisceration of the Bellwether Counties' rights as holders of R.S. 2477 rights-of-way.  The United States' actions for these three Jurisdictional Roads are in conflict with the bundle of property rights an R.S. 2477 holder possesses.  The court concludes that conflict is sufficient to create a title dispute under the Quiet Title Act.

### D.  Other Action Exerting Control Over Plaintiffs' Management Authority

The degree of the United States' management of the roads in Kane County is reflected down to the level of road numbering signs.  Kane County developed a road numbering system with lower numbers on the west side of the County and increasing numbers as one travels east.[25]  Trial

---

[25]  Garfield County has a similar road numbering system because Kane County and Garfield County worked cooperatively to develop those numbering systems.

Tr., at 1464–65 (M. Habbeshaw). By knowing the road number, one can approximate where they are in the County. *Id.* at 1465–66. Due to the size of Kane County, it was an important safety issue. *See id.* The County implemented its road number signs in or about 2005.[26]

On April 26, 2005, Sally Wisely, the BLM State Director sent a letter to Kane County. She remarked that she had wanted "the County and the BLM to work together to identify those routes which are *undoubtedly County roads* and those for which we have differences about their status under R.S. 2477." Lttr, at 1 (Pls. Ex. 617) (emphasis added). Kane County had declined to work with the BLM on signage, seeing it as the County's right to manage its R.S. 2477 roads, and the County had proceeded to post its signs. *See id.* at 1–2. Ms. Wisely informed the County that it must refrain from "placing County road signs on public land administered by the BLM," and she directed the County to remove all such signs immediately. *Id.* at 2. She warned that failure to do so "within two weeks" would result in "appropriate legal action against the County." *Id.*

Kane County's road numbering system was specific to roads. The County was managing its transportation system versus managing the lands. Management of a road is an integral part of the rights held by an R.S. 2477 holder. The BLM's instruction for Kane County to remove the signs was an implicit denial that Kane County was the title holder of the roads. That instruction applied to all the Jurisdictional Roads, except for the Garfield County G9000 segment of the Hole-in-the-Rock Road.

---

[26] Kane County also included decals on the signs indicating that roads were open to use by off-highway vehicles. That action increased the division between the County and the United States, and it resulted in a lawsuit. While the issue about the road signs was broader than simply implementing a numbering system, the BLM's challenge was not limited only to the decals, but the signs as a whole.

The BLM's position about the road numbering signs is consistent with the 30(b)(6) deposition testimony referenced earlier in this decision. The United States has affirmatively stated and acted in conformance with its statements that Plaintiffs are not R.S. 2477 holders of any of the Bellwether roads.

### E.      Conclusion

Because the United States expressly declines to take a position on whether Plaintiffs are R.S. 2477 holders of the Jurisdictional Roads, in an attempt to defeat jurisdiction, yet treats Plaintiffs as non-holders absent adjudication by a court of law, the United States will have accomplished by policy, practice, and management plans what it cannot otherwise do under established law. It not only has set forth a course of action for title never to be determined, but since it treats Plaintiffs as non-holders, the effect of the United States' actions is to divest Plaintiffs perpetually of the bundle of rights Plaintiffs exercised prior to October 21, 1976.

Should the United States' jurisdictional posture be allowed to stand, the United States effectively would gain control not only of the eight Jurisdictional Roads, but also all roads that are significant enough for the United States to classify as open. In short, the United States will control the major roads. The court emphasizes that what is at issue is a property right where title *vested* on or before October 21, 1976. Property rights are foundational and critical for independence and economic prosperity. The R.S. 2477 property rights determine if the State and counties will have control over their transportation systems, or whether the federal government will take that control from the State and counties for almost two-thirds of the State.

For a disputed title to exist under the Quiet Title Act, "a plaintiff need not show the United States took direct action to close or deny access to a road—indirect action or assertions that

*actually conflict* with a plaintiff's title will suffice." *Kane County (1)*, 772 F.3d at 1212 (emphasis added).  While the United States has been careful not to expressly dispute title, its actions and requirements are sufficient to actually conflict with Plaintiffs' title.  Accordingly, the court denies the United States' motions to dismiss the Jurisdictional Roads because their title has been disputed under the Quiet Title Act.

## VI.  REQUIREMENT TO PLEAD WITH PARTICULARITY

When asserting a claim under the QTA, Section 2409a(d) requires that "[t]he complaint set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States."  The United States asserts Plaintiffs failed to meet this requirement.

The United States made the same assertion in *Washington County v. United States*, 903 F. Supp. 40, 41 (D. Utah 1995), and won dismissal of the complaint.  Washington County's complaint sought "to establish its interest in certain rights-of-way as shown on the map attached to plaintiff's complaint."  *Id.* (quotations omitted). It asserted it was "the owner of the highway rights-of-way shown on the maps attached to its complaint and that it acquired its rights-of-way through public use, by County construction and maintenance of the rights-of-way or both."  *Id.* at 42 (quotations omitted).  The court concluded the allegations were conclusory and did "not identify 'with particularity' any interest in real property," or "the circumstances under which any property interest was acquired."  *Id.* (quotations omitted).

In contrast, Plaintiffs' operative complaints in this consolidated action span over 2,000 pages.  *See Kane County (2)*, Case No. 2:10-cv-1073 (ECF Nos. 21, 57, 395) (spanning almost 900 pages); *Kane County (3)*, Case No. 2:11-cv-1031 (ECF No. 7) (spanning 1,366 pages); *Kane*

*County (4)*, Case No. 2:12-cv-476 (ECF No. 2) (spanning 22 pages).  Plaintiffs coupled their complaints with exhibits spanning thousands of additional pages to identify "the beginning, course, and end of each road."  *Kane Cnty. Opp'n to Amended Mot. to Dismiss.*, at 18 (ECF No. 691). The complaints and exhibits identify each road, the path each road travels, and how the roads were acquired.  They contain maps, pictures of the roads, and affidavits concerning the histories and uses of the roads.

The complaints and exhibits are distinguishable from that in the *Washington County* case. For example, the claim for the K1300 Elephant Cove road details the location of the road in Kane County, when the road appeared on maps and what maps the road appeared on, its acceptance as a Kane County highway on the 1950 General Highway map, demonstration of the acceptance by it being maintained, and the adverse claim made by the United States.  Amended Complaint, ¶¶ 209–238 (ECF No. 21).  While some of Kane County's assertions are conclusory, the court concludes Kane County's complaints and exhibits contain remarkable detail,[27] and are sufficient to meet the requirements under Section 2409a(d).  The court also reaches the same conclusion concerning the allegations for G9000 Hole-in-the-Rock Road in Garfield County's complaint, ¶¶ 751–81 (ECF No. 2).

## VII.   QUIET TITLE ACT'S TWELVE YEAR STATUTE OF LIMITATION

Besides the Jurisdictional Roads, the United States originally moved to dismiss three other roads on the ground they were jurisdictionally barred due to the QTA's statute of limitations.

---

[27]   The level of detail required to plead an R.S. 2477 road with particularity cannot be set so high as to defeat a congressional grant of the rights-of-way.  When one considers that no records were required to be kept for these roads, the level of detail Plaintiffs provided in their complaints shows they have taken their asserted property rights seriously.

Those three roads are K1410, K6280 Rush Beds, and K6290 Rush Beds Springs (the "Three Roads").  As explained further below, the United States no longer asserts the QTA's statute of limitations is jurisdictional, but it does still seek dismissal of the Three Roads based on the statute of limitations.  For the reasons stated below, the court dismisses K1410, but denies the United States' motion as to K6280 Rush Beds and K6290 Rush Beds Springs.[28]

A.      **QTA's Statute of Limitations Is Not Jurisdictional**

At the time the United States submitted its briefing on the motions to dismiss, the QTA's statute of limitations was considered to be jurisdictional, in the Tenth Circuit, regardless of whether a claim was brought by a state or a non-state.  The United States Supreme Court recently held, however, that the statute of limitations is not jurisdictional.  *Wilkins v. United States*, 598 U.S. 152, 156 (2023).  "Limits on subject-matter jurisdiction . . . have a unique potential to disrupts the orderly course of litigation," and "alters the normal operation of our adversarial system."  *Id.* at 157 (quotations and citation omitted).  Unlike other rules that may be raised only "at certain times," jurisdictional challenges "may be raised at any time."  *Id.* (quotations and citation omitted).  Based on *Wilkins*, those issues are no longer present because it is now known that "Section 2409a(g) is a nonjurisdictional claims-processing rule."  *Id.* at 165.

Although *Wilkins* only referred to Section 2409a(g), which applies to all civil actions except those involving a State, the United States has notified the court that it "withdraws its arguments as being based on Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction."  Notice of Supp.

---

[28]   The United States asserts the State merely has derivative rights, so if the Counties' R.S. 2477 claims fail, so too do Utah's.  It is unnecessary to reach this issue because, regardless of whether the non-state standard or the state standard for the limitations period applies, the outcome would be the same for the Three Roads.

Auth., at 2 (ECF No. 762).  The court concludes the United States properly withdrew its argument as against the Bellwether Counties and the State.  Applying a claims-processing rule to the counties under Section 2409a(g) and a jurisdictional standard to states is not required by the statutory language, and it would cause a disruption to the orderly function of the QTA.  Accordingly, the court concurs the United States' arguments should be recast and treated as arguments "based on the Quiet Title Act's claims-processing rules."  Notice of Supp. Auth., at 2.

The Supreme Court's ruling impacts the burden of proof.  "The party invoking a federal court's jurisdiction bears the burden of establishing subject-matter jurisdiction."  *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019).  Since the QTA's statute of limitations is not jurisdictional, Plaintiffs do not bear the burden.  Instead, as a claims processing rule, "[t]he statute of limitations is an affirmative defense that must be raised by the defendant."  *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022).  In this case, the United States bears the burden of showing "the date, event, and reasonable notice that triggered and ran the statute of limitations."  Kane County Resp. to Supp. Brief, at 7 (ECF No. 780).  The court now addresses the United States' respective challenges to the Three Roads.

**B.    K1410**

The K1410 road "is located in the Parunuweap Canyon Wilderness Study Area."  U.S. Amended Mot. to Dismiss, at 26 (ECF No. 671).  Plaintiffs assert it is a Class D road that is approximately 2.7 miles long.  K1410 Map (Pls. Ex. 11).  The road is not shown on any historical maps, including U.S. Geological Survey topographic maps or on Plaintiffs' 1977 Class D map.  Kane Cnty.'s Proposed Findings of Fact, ¶¶ 231–36 (ECF No. 659).  "When the United States inventoried the area in 1979–80, it found no road or way that corresponded with Plaintiffs' K1410

claimed route."  U.S. Amended Mot. to Dismiss, at 26 (ECF No. 671).  Consequently, K1410 was not designated "as a road or way in the published Wilderness Study Area."  *Id.*  Plaintiffs had notice of that omission by the 1980s.  *See generally* BLM State Director Lttr. (Feb. 26, 1981) (Df. Ex. 1545) (addressing Kane County's objection to the inventory).

In the 1990s, a BLM employee saw people camping on the K1410 road during hunting season.  Salamacha Depo., 17:4–15 (Df. Ex. 1971).  Based on BLM maps, the employee tried blocking the road with signs stating no vehicles were allowed, but his efforts were not successful because people continued using the road.  *Id.* 16:12–18, 17:17–23, 48:18–25.

In addition to the WSA inventory omitting the road and the road being posted as closed, the United States asserts its management of the area provided notice of an adverse claim because its non-impairment standard is contrary to the rights of an R.S. 2477 holder.  Although the Tenth Circuit has previously rejected this argument, the United States contends the ruling only applied to roads shown on the WSA inventory.  U.S. Amended Mot. to Dismiss, at 26–27 & n.10 (ECF No. 671).  This court disagrees.

Whether a road is on a WSA inventory or not, all valid existing R.S. 2477 rights are exempt from the non-impairment standard, which "ensures that the federal government's new uses of its servient estate—the creation of WSAs—do not eviscerate the County's dominant estate." *Sierra Club v. Hodel*, 848 F.2d 1068, 1087 (10th Cir. 1988); *see also Kane County (1)*, 772 F.3d at 1217–18.  Thus, merely imposing non-impairment standards on a WSA does not provide notice that the United States is asserting an adverse claim to title of an R.S. 2477 road.

That said, the absence of K1410 on any map, including Plaintiffs' 1977 Class D map, makes the status of this road questionable.  The omission of K1410 from the WSA inventory was

consistent with Plaintiffs' own omission, and the inventory placed Kane County on notice that the United States was not recognizing an R.S. 2477 road or way in that area. The State also received notice when the WSA inventory was published. Additionally, a BLM employee posted the road as closed in the 1990s. He attempted to block the road with signs. Salamacha Depo. 17:17–21 (Df. Ex. 1971). Although the public disregarded the signs, the signs nevertheless were present to try to block the road itself. The court concludes these acts triggered the statute of limitations, and because Plaintiffs filed suit more than twelve years after the limitations period was triggered, their claims are barred as to K1410.

### C. K6280 Rush Beds and K6290 Rush Beds Springs

"The northern two-mile segment  of the" K6280 Rush Beds road . . . is designated as BLM Route 442 and open under the 2000 [Monument Plan], while the remaining nine-mile segment is closed to public motor vehicles." U.S. Amended Mot. to Dismiss, at 25 n. 9 (ECF No. 671) (citing Df. Ex. 1491). The closure was not present on November 14, 1980, when "the BLM published its Final Intensive Inventory Decision for Utah in the Federal Register." Kane Cnty. Opp'n to Amended Mot. to Dismiss, at 38 (ECF No. 691) (citing 45 Fed. Reg. 75,602 (Nov. 14, 1980)). Unlike K1410, both K6280 Rush Beds, and K6290 Rush Beds Springs were shown on a Wilderness Study Area map as roads that were open. *Id.*; Paria-Hackberry WSA Map (Pls. Ex. 604). Thus, the inventory and map provided no notice to Kane County or the State that the United States was claiming an adverse interest.

The United States sole evidence that Kane County and the State had notice of an adverse claim prior to 2000 is testimony from a BLM employee that he posted the roads as closed in approximately 1991. U.S. Amended Mot. to Dismiss, at 25 (ECF No. 671) (citing Salamacha

Depo., at 26:12–25 (Df. Ex. 1971).  The BLM employee had authority to act consistent with BLM maps.  Salamacha Depo., 48:18–25 (stating the BLM gave him "free reign to do it as what I saw it on the maps").  Posting the Rush Beds roads as closed would not have been consistent with the WSA map, or the BLM employee's authority.  *Mills v. United States*, 742 F.3d 400, 405 (9th Cir. 2014) (stating unauthorized actions by a government employee "is not evidence that the United States has taken an [adverse] position").

Moreover, the BLM employee's testimony was contradictory.  He testified that he marked the WSA "boundaries and tried to close the main way because it was not being used."  Salamacha Depo., 26:12–20 (Df. Ex. 1971).  "People kept pulling the signs up," though, and since the road is in a more remote area, the BLM employee only visited it every three to four months.  *Id.* 26:19–22, 28:2–4.  Yet, he also testified that it was his practice to post a "closed" sign "in the middle of the repeated tracks, which would then be *next to the main road* where the vehicles had turned."  *Id.* 64:4–17 (emphasis added).  He posted the signs on the edge of the road to show the WSA.  *Id.* 67:14–18. The BLM employee did not place the signs on the road.  *Id.* 68:11–19.  He placed the signs where needed so traffic did not leave the main road and travel into the WSA.  *Id.* 64:2–11, 68:11–25.  He did not place a "no driving" sign south or north on road.  *Id.* 69:2–10.

The United States bears the burden of proving Kane County knew or should have known the United States was claiming an adverse interest in the 1990s.  It further bears the burden of showing the State received notice.  Unlike the K1410 road, the BLM employee did not post "closed" signs in the middle of the Rush Beds roads.  He posted them on the edges.  Based on his testimony, it appears the BLM employee was posting signs marking the boundary of the WSA and where unauthorized tracks left the Rush Beds roads.  Because the roads were listed on the WSA

inventory and open on the Paria-Hackberry WSA map, had the BLM employee posted the roads as closed, he would have been acting contrary to what he was charged to do.  The court therefore concludes the United States has failed to show that the statute of limitations commenced running in the 1990s as to the K6280 Rush Beds and K6290 Rush Beds Springs roads.  The United States' motion to dismiss those two claims is denied.

## VIII.  UTAH'S SEVEN YEAR STATUTE OF LIMITATIONS

This court issued a Memorandum Decision on October 6, 2023 addressing, in part, whether a Utah statute of limitations operated to shorten when Plaintiffs could bring an action under the federal Quiet Title Act's statute of limitations.  Mem. Dec., at 2–3 (ECF No. 773) (filed on October 10, 2023).  The court concluded and continues to conclude that Utah's seven-year statute of limitations does not supplant the QTA's twelve-year statute of limitations.  Nevertheless, the court amends its analysis under Sections I.A., I.B, and I.C of that opinion and substitutes Sections VIII.A., VIII.B., and VIII.C. from this decision in their place.

### A.    Section 78B-2-201(1)'s History and Application

The United States seeks dismissal of nine bellwether roads on the ground that Utah's seven-year statute of limitations bars the claims.  The nine roads are:  K1410; K6200 Paria River; K6280 Rush Beds; K6290 Rush Beds Springs; K7020; K7025; K7050 Blue Trail; K7300 Last Chance; and K8650 Grand Bench Neck.

#### i.    Certification of Statutory Issue to the Utah Supreme Court

On April 17, 2015, three judges from this district certified a question to the Utah Supreme Court:  "Are Utah Code § 78B-2-201(1) and its predecessor statutes of limitations or statutes of repose?"  Order of Certification, at 3 (ECF No. 211).  "As early as 1907, . . . Utah elected to impose

a limitation on itself regarding when it may assert a right to real property." *Id.* at 5 (citing *Pioneer Inv. & Trust Co. v. Bd. of Educ.*, 99 P. 150, 152 (Utah 1909)).  By 1917, Utah law provided:

> The state will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title to the same, unless:
>
> 1.  Such *right or title shall have accrued* within seven years before any action or other proceeding for the same shall be commenced[.]

*Id.* at 5–6 (quoting Comp. Laws 1917, § 6446) (emphasis added).  This case was filed in 2010. The operative law then and to this day states:

> The state may not bring an action against any person for or with respect to any real property, its issues or profits, based upon the state's right or title to the real property, unless:
>
> (1) the *right or title to the property accrued* within seven years before any action or other proceeding is commenced[.]

Utah Code Ann. § 78B-2-201(1) (2022) (emphasis added).

Based on the language emphasized, SUWA asserted the statute "constitute[d] a statute of repose because the seven-year limitation commences when the right or title to property accrued, not when a cause of action arose."  Order for Certification, at 6–7 (ECF No. 211).  Under that interpretation, the effects would have been sweeping.  "Because every R.S. 2477 right-of-way had to accrue no later than October 21, 1976, if Section 78B-2-201(1) or its predecessor [were] a statute of repose, SUWA contend[ed] any action to quiet title had to be brought by October 21, 1983, which is seven years after FLPMA repealed R.S. 2477."  *Id.* at 7.  Although no Utah case had interpreted the statute as a statute of repose, the issue had never been squarely addressed.  Hence, the issue was certified to the Utah Supreme Court because the question was seen as controlling in this case and others.  *Id.* at 3.

The Utah Supreme Court rejected SUWA's position under the absurdity doctrine and interpreted Section 78B-2-201(1) as a statute of limitations.  *Garfield Cnty., v. United States*, 2017 UT 41, ¶ 21, 424 P.3d 46, 57–58.  That is the ruling of *Garfield County*.  The Utah Supreme Court answered that Section 78B-2-201(1) is a statute of limitations and not a statute of repose.  *Id.*  The court's analysis therefore proceeds under that statutory interpretation.  To the extent the United States contends *Garfield County* also resolved whether Utah's limitations period or the QTA's limitations period applies in this case, the court rejects that notion because it was not the issue before the Utah Supreme Court.

      ii.     <u>*Abdo* Case</u>

Prior to the above certification, on February 13, 2015, this court addressed whether a suit filed by SUWA in state court should be remanded.  *See generally Abdo v. Reyes*, 91 F. Supp. 3d 1225 (D. Utah. 2015).  In the context of analyzing complete preemption, this court stated, "if a state or county imposed a condition on itself that would limit its ability to proceed in an action against the United States, . . . nothing in the [QTA] appears to preclude such a condition."  *Id.* at 1230.  The court then stated the following:

> For example, the Quiet Title Act sets forth a 12 year statute of limitations for counties to bring suit.  This is the outer limit by which a county may bring an action against the United States once the specified dispute of title arises. The limit runs to the benefit of the United States. Consequently, a county has no authority to lengthen the time beyond 12 years. Nothing in the Act indicates, however, that Congress intended to "displace all state law on the given issue and comprehensively to regulate the area," so as to preclude a county from imposing on itself a shorter limitations period.

*Id.* at 1230–31 (internal citation omitted).  Consequently, the court concluded complete preemption

did not apply.  *Id.* at 1231.  From this, the United States argues Utah's seven-year statute applies

over the QTA's statute of limitations.  That was not the issue before this court in *Abdo*, and the

United States' argument bypasses addressing the full analysis needed to make that determination.

### iii.   QTA's Limitations Period Is Not Supplanted by Utah Law

The QTA states, "[t]the United States may be named as a party defendant in a civil action

under this section to adjudicate a disputed title to real property in which the United States claims

an interest."  28 U.S.C. § 2409a(a).  "The QTA authorizes (and so waives the Government's

sovereign immunity from) a particular type of action, known as a quiet title suit . . . ."  *Match-E-*

*Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).  The focus

is on allowance of an action and waiver of sovereign immunity to accomplish that action, with

Congress affording twelve-years to bring such an action.

Notwithstanding this allowance, because complete preemption does not bar Utah from

imposing on itself a shorter limitations period, the United States contends Utah did impose a

shorter period on itself under Section 78B-2-201(1).  Thus, according to the United States,

Plaintiffs' claims for nine bellwether roads are barred as untimely by a seven-year statute of

limitations.  The United States, in effect, is interpreting Utah law, and then arguing for it to be

applied according to the United States' interpretation.  The applicable interpretation, however, is

that of the Utah Supreme Court concerning how Utah's statutes of limitation apply.

Since at least 1915, and without any change made by the Utah legislature, the Utah

Supreme Court has held that true quiet title actions "are not subject to a statute of limitations."  *In*

*re Hoopiiaina Trust*, 2006 UT 53, ¶¶ 22–23, 28, 144 P.3d 1129, 1136–37 (citing *Branting v. Salt*

*Lake City*, 153 P. 995 (1915)).  "A true quiet title action is a suit brought to quiet an *existing* title

against an adverse or hostile claim of another, and the effect of a decree quieting title is not to *vest* title but rather is to *perfect* an existing title as against other claimants." *Id.* ¶ 26, 144 P.3d at 1137 (emphasis in original) (quotations and citations omitted).  *In re Hoopiiaina Trust*, and more recently *WDIS, LLC v. Hi-Country Estates Homeowners Association*, 2019 UT 45, ¶ 34, 449 P.3d 171, 181 (stating "[u]nder Utah law, a true quiet title action is never barred by the statute of limitations"), show that Utah does not favor leaving a dispute on title for property where one contends that title is already existing and vested.  Because clear title is desired, for more than a hundred years, Utah has not applied a statute of limitations to true quiet title actions.

Plaintiffs claim their title to certain roads is already existing and that vesting occurred prior to October 21, 1976.  Were their claims brought under a Utah law in a Utah court, Utah's seven-year statute of limitations would not apply.  If Utah would not apply the limitations period were the action brought under Utah law, it is untenable to contend that Utah nevertheless intended to superimpose its limitations period on the QTA to bar an action.  This is especially so when Utah law on the issue preceded the QTA by decades.  The court applies Section 78B-2-201(1) and its predecessor statutes in accordance with Utah's interpretation of its laws, and it denies the United States' motion to dismiss the nine bellwether roads.

### B.    A More Particular Statute Applies

Utah's seven-year statute of limitations also is inapplicable because a more particular statute applies.  When this court addressed complete preemption in *Abdo*, it noted there is "a well-known statutory rule of construction that 'specific statutes control over more general ones,'" and the "interplay between state and federal law" would need to be determined.  *Abdo*, 91 F. Supp. 3d at 1232 n.5 (quoting *Peak Alarm Co., Inc. v. Salt Lake City Corp.*, 2013 UT 8, ¶ 19, 297 P.3d 592).

Although this court cited to caselaw to note that rule of statutory construction, the rule also exists by statute in Utah.  Section 78B-2-102 of the Utah Code states the statutes of limitation set forth in Chapter 2 apply, "except in specific cases where a different limitation is prescribed by statute."  By that pronouncement, the Utah legislature expressed its clear intent.  Thus, the Utah Supreme Court has stated Section 78B-2-102 "clearly contemplates that the statutes of limitation in Title 78B may be displaced by other, more specific statutes."  *Peak Alarm Co., Inc.*, 2013 UT 8, ¶ 20, 297 P.3d at 597.  The QTA is a more specific statute.

"[P]ursuant to 28 U.S.C. § 1346(f), Congress has specified that federal courts have exclusive [original] jurisdiction over quiet title actions against the United States."  *Abdo*, 91 F. Supp. 3d at 1230.  Therefore, quiet title actions involving the United States only are brought under 28 U.S.C. § 2409a.  The QTA is a more specific statute that applies when a quiet title action is brought against the United States as opposed to the more general actions stated under Section 78B-2-201 of the Utah Code.  The court concludes Utah's seven-year statute of limitations also is inapplicable for that reason.

## C.      Who Is a Person

An issue about the definition of "person" also has been raised.  As stated above, Section 78B-2-201 provides, "(1) The state may not bring an action against any *person* for or with respect to any real property," if the claim arose more than seven years earlier.  Utah Code Ann. § 78B-2-201(1) (emphasis added).  The United States asserts that the seven-year statute of limitations applies because the United States is included within the definition of a "person."

The United States contends the Utah Supreme Court necessarily decided this issue in its favor in *Garfield County v. United States*, 2017 UT 41, 424 P.3d 46.  U.S. Amended Mot. to

Dismiss, at 10 n.1 (ECF No. 671); U.S. Reply in Supp. of Mot. to Dismiss, at 28–29 (ECF No. 704). This court disagrees. The Utah Supreme Court stated, "there are persuasive arguments both for and against reading the word 'person' to include the United States." *Garfield Cnty.*, 2017 UT 41, ¶ 12 n.25. Due to "the strength of [the] competing arguments," the Court found "it sufficient *to assume* for purposes of this opinion that the word 'person' in section 201 and its predecessor includes the United States." *Id.* (emphasis added). When a court notes that there are competing arguments and *assumes* something for purposes of the decision, the court has not reached the issue and it remains an open question. Thus, whether the United States is a "person" under Section 78B-2-201 has not been resolved.

The issue of who a "person" is potentially has far-reaching implications. As discussed above, over sixty-three percent of the land within Utah is owned and managed by the federal government. Kane County noted "there are millions of acres of lands that were granted to the State by the United States, but have not been the subject of a title suit." Mem. in Opp'n, at 29 (ECF No. 691). It then stated, "[t]he Court should take pause and question why the United States is now asking for a finding that Section 201 applies to bar such title suits." *Id.* The question is sobering when one considers its scope and how the United States has handled even vested property rights. Kane County's question also highlights the challenge a legislature faces when legislating for an unknown future. That is why rules of construction are important as well as rules of exception to a stated statute.

For example, the Utah Legislature has specified the rules of statutory construction must be followed unless "the construction would be: (i) inconsistent with the manifest intent of the Legislature; or (ii) repugnant to the context of the statute." Utah Code Ann. § 68-3-12(1)(a)(i)–

(ii) (2021).  Those rules of exception hedge against future situations that are unknown at the time of legislating but would be harmful to the State were the rules of statutory construction strictly applied.

To the extent the United States contends the State meant to divest itself of the opportunity to pursue a quiet title action against the United States before the State even could sue the United States,[29] the court understands why the Utah Supreme Court found the absurdity doctrine applied to a similar argument in *Garfield County*.  It seems such a construct would be contrary to legislative intent and repugnant to the context of the statute.  To give effect to legislative intent, it further seems the most logical interpretation of the statute would be to find that the United States is not included within the definition of a "person."

The court does not reach the issue, however, for two reasons.  First, the analyses above show that Utah's seven-year statute of limitations is not applicable to R.S. 2477 quiet title claims, so it is not necessary to reach the issue of who is a "person."  Second, because the issue potentially has far-reaching implications, interpretation of the statute should be an issue for the Utah Supreme Court.  Were this court to reach the issue, it would be doing so without that needed clarity about the future to understand the scope of such a declaration.  Accordingly, that issue must wait for another day.

---

[29]   The Utah statute at issue was instituted in substantially the same form while Utah was still a territory.  *See* Act of Feb. 16, 1872, § 3 (ECF No. 691-3 at 4).  The Quiet Title Act was not passed until 1972.  Act of Oct. 25, 1972, Pub. L. No. 92–562, 86 Stat. 1176 (codified at 28 U.S.C. § 2409a).  "Only upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land.  Prior to 1972, States and all others asserting title to land claims by the United States had only limited means of obtaining a resolution of a title dispute." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983).  Either "they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief." *Id.*

## CONCLUSION

For the reasons stated above, the court grants in part and denies in part the United States' Amended Motion to Dismiss (ECF No. 671 in Case No. 2:10-cv-1073).  The court denies the United States' Motion to Dismiss (ECF No. 135 in Case No. 2:11-cv-1045) specifically as to G9000 Hole-in-the-Rock Road.  The court denies the United States' Renewed Motions to Dismiss (ECF No. 755 in Case No. 2:10-cv-1073 and ECF No. 325 in Case No. 2:11-cv-1045), including those motions incorporated by reference therein.

1. The court DENIES dismissal of the Jurisdictional Roads because disputed title exists. The Jurisdictional Roads are:  K1300 Elephant Cove; K4200 Kitchen Corral; K4500 Willis Creek; K8200 Sit Down Bench; K8600 Little Valley; K6000 House Rock Valley Road; K9000 Hole-in-the-Rock Road as it traverses Kane County; and G9000 Hole-in-the-Rock Road as it traverses Garfield County.

2. The court DENIES dismissal of the nine bellwether roads that the United States seeks to dismiss based on Utah's seven-year statute of limitations.  Utah's seven-year statute of limitations is not applicable.  The nine roads are:  K1410; K6200 Paria River; K6280 Rush Beds; K6290 Rush Beds Springs; K7020; K7025; K7050 Blue Trail; K7300 Last Chance; and K8650 Grand Bench Neck.

3. As for the three roads that the United States seeks to dismiss based on the QTA's twelve-year statute of limitations, the court GRANTS dismissal of the State and Kane County's K1410 claim.  The court DENIES dismissal of the State and Kane County's K6280 Rush Beds and K6290 Rush Beds Springs claims because the United States has failed to show those claims are barred by the QTA's statute of limitations.

DATED this 9th day of August, 2024.

BY THE COURT:

Clark Waddoups
United States District Judge